PHEBE NILES FORSHAY, EXECUTRIX, APPELLANT, V. WILLIAM H. JOHNSTON, APPELLEE.

13 N. W. 2d 873

FILED MARCH 31, 1944. No. 31697.

*Edwin D. Crites,* for appellant.

*Greydon L. Nichols, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

PAINE, J.

This is an action in ejectment, brought by the executrix against William H. Johnston, defendant and appellee. The court sustained his claim to a statutory homestead right to the land in question, and found he was not guilty of withholding the premises from the plaintiff. The question in-

volved is whether the decedent and defendant Johnston were husband and wife by virtue of a common-law marriage.

Petition was filed July 20, 1940, by Phebe Niles Forshay, as executrix of the last will and testament of Reana D. Parrotte, deceased, alleging that she has a legal estate in, and is entitled to the possession of, lot 5, block 23, in the original town of Chadron; that on May 26, 1940, Reana D. Parrotte died testate, seized and possessed of said real estate; that on July 3, 1940, the will was admitted to probate in the county court for Dawes county, and on said day petitioner was duly appointed executrix, and as such duly qualified executrix is entitled to the possession of said real estate.

Plaintiff further alleges that deceased bequeathed numerous pecuniary legacies under her last will and testament, and it is necessary that plaintiff as executrix sell the real estate for the purpose of paying the funeral expenses, the expenses of the last illness of deceased, her just debts and the expenses of administration, and the said legacies, all of which are unpaid, and for the payment of which petitioner is without means except it be the proceeds of the sale of said real estate and of another tract of real estate of small value, insufficient in amount for the payment of said items, and plaintiff alleges that she is prevented from selling said premises by the defendant, who wrongfully refuses to surrender possession; that said real estate was not otherwise disposed of under the will of deceased, and that the value of the rents and profits of said property is $15 a month, amounting to the sum of $105.

Plaintiff further states that she is one of the residuary devisees and legatees under the will of the deceased. Judgment is demanded against defendant for (1) the restitution of said lands and premises; (2) for the sum of $500 damages for the withholding thereof; (3) for the sum of $105, the value of the rents and profits thereof up to the date of the filing of suit, and in addition thereto the rents and profits at the rate of $15 a month until possession is obtained.

On January 24, 1941, William H. Johnston filed answer, denying each and every allegation of the petition not specifically admitted, and for further answer alleges that Reana D. Parrotte died May 26, 1940, and that defendant was, at the time of her death and for many years prior thereto, the husband of Reana D. Parrotte, and that he expects to exercise his right under section 30-107, Comp. St. 1929, to take the property that he is entitled to under the law out of the estate of his said wife, under his election to take under the statutes.

Defendant further alleges that the property described in the petition was the family homestead of deceased and of this defendant, husband and wife, at the time of the death of deceased, and defendant has a life estate in said homestead, and has occupied it as such since the death of deceased, Reana D. Parrotte, whose true name was Reana D. Parrotte Johnston; that defendant is entitled to the possession of said property under the laws of Nebraska, from which defendant cannot be expelled by ejection or any other action, and defendant prays that the action be dismissed.

Plaintiff filed reply, denying each and every allegation of new matter contained in defendant's answer. The cause was tried to the court on October 7, 1942, a jury being waived, and the court found defendant not guilty of withholding the premises described from the plaintiff, and it was adjudged that defendant go hence without day.

The errors relied upon by the plaintiff for a reversal will be briefly stated. It is charged that there was no competent evidence to show any valid marriage agreement, common-law or otherwise, between these parties, and no proof of general reputation of marriage; that the defendant failed to meet the burden of proving the existence of a valid marriage relation; that the trial court erred in permitting defendant Johnston to testify over plaintiff's objection concerning conversations, communications and transactions between himself and Mrs. Parrotte, and as to what she said to others in his presence, under section 20-1201, Comp. St. 1929, and also objected to on the ground that Johnston was

an incompetent witness under section 20-1204, Comp. St. 1929.

It is also assigned as error that the court permitted witness Ford to testify, over objection, that after Mrs. Parrotte moved to Nebraska in July, 1923, she introduced herself to him as Mrs. Johnston, such testimony being incompetent, irrelevant and immaterial.

The last assignment of error is that the court erred in admitting, over objection, an envelope and letter, exhibits Nos. 3 and 4. The envelope was postmarked in California at Los Angeles, April 3, 1935, and the envelope was addressed "Mrs. Wm. Johnston, 426 Morehead St., Chadron, Nebr." by the plaintiff in this case, who was living in Los Angeles.

The plaintiff, to support the allegations of her petition, introduced the original files from the county court for Dawes county, and also the will of Mrs. Reana D. Parrotte, and the certificate of probate, with leave to substitute copies. It was then stipulated generally that on the date of her death decedent was the owner of lot 5, block 23, in an addition to the original town of Chadron, which had been conveyed to her under the name of Reana D. Parrotte; that she died May 26, 1940, and that her last will was admitted to probate July 3, 1940; that plaintiff was appointed executrix; that the estate is still in process of administration; that property involved is a lot, with a small frame dwelling thereon, of which the defendant has refused to give up possession to executrix, which she has demanded, and that certain claims have been allowed against said estate, to wit, Mayo Clinic, $320, funeral expenses, $455, and for opening grave, $15, and that a certain real estate broker, if called as a witness, would testify that the fair rental value of said property was $15 a month. Thereupon, the plaintiff rests her case.

Mr. Nichols, counsel for defendant, thereupon stipulated with counsel for plaintiff that defendant's exhibit No. 1 is the original election to take under the law, signed by defendant and filed in the county court on January 24, 1941,

less than one year after issuance of letters testamentary; to which stipulation Mr. Crites reserved the objection that defendant was not the husband of deceased, and that no sufficient foundation was laid for its introduction, but the identity and genuineness of the paper was admitted, and same was received by the court.

Thereupon, the defendant called as his first witness E. L. Ford, a plumber, of Chadron, who testified that they came to his place in July, 1923, and she said her name was Johnston, and introduced William Johnston as her husband, and said she owned the place by her sister's, Mrs. Anderson's, place, and Mrs. Johnston furnished some of the material and witness did the work, and the bill showed that they paid witness $10 for the work in May, 1924.

Dr. Milton B. McDowell testified that he was acquainted with the defendant and his wife, Mrs. Johnston. He did not know her name was Mrs. Reana D. Parrotte, but knew her as Mrs. Johnston, having first met her about 1925. "She came up to my office and told me she was Mrs. William Johnston, she said, 'you know my husband, he works down there at the shops.'" After that he went to their home many times to see her when she was ill, sometimes at 11 or 12 o'clock, or 2 or 3 o'clock in the morning, when she would have a bad spell. Mr. Johnston made all the payments to him. When she was in her last illness, Mr. Johnston was there nearly every time witness went there. "He always helped me change the dressings, assisted me any way he could." Dr. McDowell testified that he had seen them out riding in an automobile frequently.

The deposition of Ruth J. Smith was taken at Minneapolis on September 30, 1942. She testified that she was a sister of defendant, and that her brother William first introduced the deceased to her in December, 1922, as his wife. She met her on other occasions. After Billy and Reana went to Chadron, Billy wrote letters to them and always signed them "Billy and Reana," and invited them to visit him, and in the summer of 1928 witness and her mother visited him at Chadron and stayed for about ten days. She

testified that Reana and her brother William occupied the same bed. "Q. How do you know that? * * * A. Because there was just one other bed besides the one my mother and I occupied."

Mae Hutchins, age 59, testified by deposition that she lives in Minneapolis, and is a sister of defendant. Her brother came over to her home in February of 1923. "William came over to my house in the evening with Reana, and he said, 'Mae, this is Reana, my wife.' He had told me before that he was married." He used to come over occasionally and visit, and he introduced Reana to witness' husband as his wife, and witness and her husband visited them. Asked whether witness could tell whether or not Mr. and Mrs. Johnston cohabited together as married persons, witness answered: "Yes, they did. * * * At my home and also at my sister's. * * * About the 7th of March, 1929, after my husband's funeral, and at my sister's in July, 1934; * * * she always called my mother 'mother.' "

Hazel Becker testified by deposition that she resides in Minneapolis, is 52 years old, and is a sister of defendant, who is younger than she is. She testified that the general understanding between her brothers and sisters that they were married was first created around Christmas, 1922, when "our family met her as his wife and Billy's friends talked to us about Billy being married and about his marrying a woman who appeared much older than himself."

The deposition of Ethel Stuart, a sister of defendant, shows that she also resides in Minneapolis, and met Reana D. Johnston once at her mother's house. "She was in the bedroom at my mother's house and my brother's wife took me into the bedroom and introduced Reana as Billy's wife." He was sitting there at the time. To all other questions asked this witness, the objections of Mr. Crites were sustained.

Nellie Johnston testified by deposition that she resided in Minneapolis, was 77 years old, and was the mother of defendant. She said she got him exempted from service in the last war, as he was her sole support; he stayed with her un-

til 1921. She said that her son brought Reana to her home around Christmas, 1922, "and she brought presents for the children and me, and I thought she was nice." She said they stayed that night and for several days thereafter at her home and occupied the same room. They talked about their future plans of going to Nebraska, and she said she had a house down there. "She said when we get down there, won't you come down and visit us; and later she sent me the fare for me and my daughter, Ruth, and we both went down. * * * I never knew her name was Parrotte. She was introduced to me as my son Billy's wife, Reana." She testified that when Reana was introduced by Billy she said, "How do you do, mother." She stated that Billy got passes for them and they traveled together, and went out to California, and came up to visit her, and they both told her that Billy got the pass.

At the end of the depositions Mr. Crites stated: "Let the record show that the plaintiff withdraws the cross-examination of all witnesses whose testimony was taken by deposition."

Defendant Johnston testified that he lives at 426 Morehead street, and has lived in Chadron since July 6, 1923; that he first met Reana D. Parrotte in January, 1922; that she was proprietor of the Lanning Hotel at 128 Frost street south, Minneapolis, and that he was a book and magazine salesman for Collier's, and that they entered into a perfect companionship. He testified that she was in trouble, it was a large hotel and she had lost her lease, and he "started living with her and to help her out." He rented a place over at 117 Main street southeast. He testified that they lived together as any other man and wife, that they cohabited together, slept in the same bed, ate together, she got his meals, and he took care of the hotel, and that her brother was staying there at the hotel at that time; that this companionship continued very faithfully until her death in Nebraska; that they lived together continuously in Minnesota for about 17 months; that they moved to Chadron and lived at her sister's, Mrs. Ora Anderson's, next door to the property in

question; that they had an auto tent in the back yard and lived in that; that in October, 1923, they went back to Minneapolis, sold the hotel at 207½ Market avenue, gave Mr. Gray notice to vacate the premises at 426 Morehead street, Chadron, and came back and lived all those years at that house in Chadron until she died, and that is where the defendant is living today.

Defendant also testified that in February, 1924, his brother-in-law, Gus Anderson, introduced him to the railroad authorities, and he got a job and has been working for the railroad (Northwestern) continuously ever since; that he always gave his wife his pay check, and she paid the grocery bills and taxes (the word "wife" was stricken out upon motion of Mr. Crites) ; that they had charge accounts at the store of defendant's attorney's father, and at several other stores in Chadron; that they had charge accounts at Montgomery-Ward in Denver and Montgomery-Ward in Alliance. He testified that they took many trips, and week ends they would go up to the Black Hills. He had also secured transportation for her from Chadron to Los Angeles, from Chadron to Denver, and to Lincoln, to Minneapolis, and to Rochester five times while she was sick, and he went with her on all of these trips and paid all the expenses.

It was stipulated that Reana D. Parrotte maintained an account in the First National Bank of Chadron, and also in the Farmers & Merchants Savings Bank of Minneapolis, and those accounts remained in that name until her death, and that at the time of her death she owned a Nash automobile, registered in her name as Reana D. Parrotte.

It was further stipulated that the real estate involved in this ejectment suit was acquired by Reana D. Parrotte long before the cohabitation that has been testified to between the deceased and the defendant.

After this brief review of the testimony as found in the bill of exceptions, we will take up the first question presented to this court for determination, and that is whether, under the facts and the law, the defendant is the surviving husband of the decedent.

In January, 1922, they entered into a companionship in Minneapolis, in which they openly lived together as man and wife, later the decedent's brother living in the same hotel. This relationship thus begun continued for 18 years and five months, until her death.

In this case the bill of exceptions does not disclose that either party offered in evidence the law of Minnesota in reference to marriages, or parol evidence, or decisions as to common-law marriages in Minnesota, as provided for in sections 20-1269, 20-1291, or 20-1293, Comp. St. 1929, which also provide that the unwritten, or common, law accepted in such state may be proved by parol evidence or reports of adjudicated cases.

The rule is that, if no evidence of foreign law is given, Nebraska courts presume that the law of the foreign jurisdiction which should be applied is the same as the Nebraska law, as to Constitution, statutes, and case law. See *Steinke v. Dobson,* 90 Neb. 616, 134 N. W. 169; *Triplett v. Lundeen,* 132 Neb. 434, 272 N. W. 307; *Johnson v. Hesser,* 61 Neb. 631, 85 N. W. 894; 20 Neb. Law Review, 39; 73 A. L. R. 897, Ann.

In January, 1922, when these parties orally agreed to start living together as husband and wife, the decisions of our state in force at that time said that the only essential of a valid marriage was the free consent of competent parties to live together in the marriage relation (*Eaton v. Eaton,* 66 Neb. 676, 92 N. W. 995), and it had been held that the fact of such a marriage could be proved by the testimony of one of the parties. See *Bailey v. State,* 36 Neb. 808, 55 N. W. 241.

All of these requirements for such a marriage were well set out by Judge Marshall in 1891 in his instructions to a jury, and will be found in the case of *Olson v. Peterson,* 33 Neb. 358, 50 N. W. 155.

To apply the law as set out in these and many other authorities to the facts proved in the case at bar, we find that they were competent parties to enter into the marriage relationship; that the consent of each was freely given to

then and there carry out such agreement, as shown by their acts and all the circumstances at the time, and that it was not a temporary, lustful relationship, but truly matrimonial in its nature, and was faithfully continued for over 18 years, without any evidence of a break of any kind; that the parties immediately began living together, and assumed all the mutual duties of husband and wife, and somewhat later introduced each other to relatives and friends, and to the stores in which they established credit; that the defendant took her to visit his mother as his wife, and that the wife thereafter called her "mother;" that all of the obligations usually performed by a husband were performed by the defendant, such as taking her riding in an automobile, taking her on trips to many parts of the United States, upon passes secured for her as his wife (he being a railroad man), watching over her health, taking her to Rochester to the Mayo Clinic five different times, and caring for her patiently in her last sickness.

These and other facts, proved by direct or circumstantial evidence, lead this court to the conclusion that the defendant was the common-law husband of deceased.

Plaintiff assigns as prejudicial error that the trial court permitted defendant to testify concerning communications, conversations and transactions with the deceased, as incompetent under section 20-1201, Comp. St. 1929, forbidding a husband and wife to testify concerning communications made one to the other. But this court has held: "The agreement between parties which establishes a common-law marriage is not a communication between husband and wife concerning which they are prohibited from testifying. It is not within the purview of section 20-1201, Comp. St. 1929. When the conversation occurred which created a common-law marriage, the parties were not husband and wife. The status of marriage followed and was the result of that conversation. Furthermore, it was a public matter, and because of its very nature and its public interest required its revelation. This was no more a communication between husband and wife than the promise and agreement

to take as husband or wife of the ceremonial marriage." *In re Estate of Tilton,* 129 Neb. 872, 263 N. W. 217.

Then we come to the objections founded on section 20-1202, Comp. St. 1929, that no person having a direct legal interest shall be permitted to testify when the adverse party is the representative of a deceased person. However, we are not compelled to pass upon this question, because we find there is sufficient evidence in the record, outside of the defendant's evidence, to sustain the judgment of the trial court.

The right of election of a surviving husband or wife to take under the will of the deceased or to take by inheritance is purely statutory. See Comp. St. 1929, secs. 30-107, 30-108.

" ' * * * where a husband and wife reside upon a homestead and the wife dies, the homestead character of the land continues and the surviving husband, although he may have no children or dependents residing with him, may still retain the homestead as such.' *Dougherty v. White,* 112 Neb. 675, 200 N. W. 884." *Abboud v. Boock,* 137 Neb. 652, 290 N. W. 713.

"In discussing this question, Dean Foster, in 3 Neb. Law Bulletin, 386, said: 'On the death of the homestead owner the right to the use and enjoyment of the premises passes to the surviving spouse. In many states, this is the extent of the right of such survivor under the homestead acts. The Nebraska statute and the Nebraska decisions go much further. The interest of the surviving spouse is transferable. It may be mortgaged or conveyed. It is not lost by an abandonment of the premises or by a change in the character of the use of the premises or by the remarriage of the spouse. In short, this interest is a life estate in the land.' " *Gordon v. Gordon,* 140 Neb. 400, 299 N. W. 515.

While the parties in the instant case arrived at Chadron, Nebraska, to make their home on July 6, 1923, and while the new law (Laws 1923, ch. 40) to abolish common-law marriages contracted after that date did not take effect until August 2, 1923, we have decided that, in view of our

holding, it is unnecessary to discuss the effect of their residence in Nebraska and whether or not it also constituted a valid common-law marriage.

"The general rule is that the validity of a marriage is determined by the law of the place where it was contracted; if valid there it will be held valid everywhere, and conversely if invalid by the *lex loci contractus*, it will be held invalid wherever the question may arise." 38 C. J. 1276.

We have examined all the alleged errors set out in the brief of plaintiff, and have reached the conclusion that the judgment of the trial court was right, and it is hereby affirmed.

AFFIRMED.