IN THE MATTER OF ESTATE OF DITTMAN, ETC. *v.* BIESENBACH, ADMINISTRATOR D/B/N.

[No. 18,411. Filed November 6, 1953. Rehearing denied December 18, 1953.]

*Samuel E. Beecher, Jr.,* of Terre Haute, for appellant.

*Jerdie D. Lewis,* of Terre Haute, for appellee.

KENDALL, C. J.—This action was instituted by appellee to revoke letters of administration issued to appellant. Appellee's petition alleged that he was the surviving spouse of the decedent, Louise Dittman, as a result of common-law marriage, and, therefore, entitled to administer the estate.

The trial court found for the appellee, that he was the common-law surviving spouse and so entitled to administer the estate.

Motion for new trial filed containing the following specifications, to-wit:

1. The decision of the court is not sustained by sufficient evidence.
2. The decision of the court is contrary to law.
3. The court erred in admitting in evidence over the objection of the defendant evidence offered by the witness, Herman Biesenbach, by way of exhibits purporting to be fuel bills and other bills

paid by him, as well as other references to decedent as my wife, as well as reference to intimate relations with decedent.

The assignment of error relied upon by appellant is that the trial court erred in overruling appellant's motion for new trial.

We shall first discuss the portion of the case dealing with the first two specifications in appellant's motion for new trial. To do this adequately, it is necessary to determine under the Indiana law what the essential requirements are to constitute common-law marriage.

In the case of *Meehan* v. *Edward Valve, etc. Co.* (1917), 65 Ind. App. 342, 117 N. E. 265, in construing what constitutes a common-law marriage, the court said:

> "While common-law marriages are in derogation of our statutes, still such marriages are recognized as valid and binding where made between parties of contracting capacity by their mutual assent, followed by cohabitation as husband and wife, together with such other circumstances as are essential to the establishment of such a marriage."

The further language is also used in the same case, as follows:

> "In short, enough must be said and done by the contracting parties to show an intention to contract marriage and assume the relation of husband and wife."

This case is cited with approval in the case of *Schilling* v. *Parsons, Administrator* (1941), 110 Ind. App. 52, 36 N. E. 2d 958.

To constitute a common-law marriage more is required than proof of a contract. Such contract must

be acted upon by a holding out of such relationship by the respective parties thereto. In the case of *Schilling* v. *Parsons,* Administrator, *supra,* the court said:

"But where the contract between the parties is oral but not witnessed, even though followed by cohabitation, an additional factor is necessary to establish a common-law marriage. Under such circumstances there must be *a holding out by the parties of their marriage status to at least such part of the public in the community in which they live as is made up of their acquaintances, neighbors and relatives.*" (Our emphasis)

Guided by this general rule, we proceed to review the evidence for the purpose of determining whether the same supports the judgment of the trial court.

The appellee lived at the home of decedent, Louise Dittman, 1115 Poplar Street, Terre Haute, Indiana, from December, 1942, until her death, July 5, 1952; that during that period he went to California for approximately six weeks, at which time he received a letter written in German from the decedent addressed to "Dear Herman" and signed "Yours, Louise," asking him to return to Terre Haute, which he subsequently did; that during the time that he was at this address, he paid all coal, light and gas bills and provided food; that during a great portion of the period the decedent was in ill health; that appellee waited and cared for her, did the washing and cleaning of the house, mowed the yard; that he also operated a custom meat-curing business in the barn on the premises; that the decedent had a foot doctor to care for her who was paid for by the appellee; that the said doctor referred to the decedent as Mrs. Biesenbach and that she carried her name in her account book as Mrs. Biesenbach; the

doctor further testified that decedent referred to Mr. Biesenbach as "my husband."

The appellee testified that he had intimate relations with the decedent.

A witness who lived next door testified on direct examination as follows: "Q. But you have heard her say to others, 'Wait, I will call my husband'? A. Yes, she would say 'I will call my husband, he is down there.' Q. Living next door there, as far as you knew, they were husband and wife? A. I never figured they were; they lived as husband and wife apparently."

Another witness who lived next door testified as follows: "Q. Just tell the Court what you have seen Mr. Biesenbach do around the house there when you have been there? A. Well, to me they lived like husband and wife; he seemed to take care of all the work that is that I could see, that a husband would do around the home, and they seemed to be very happy together and very congenial, and I saw him in his garden and saw him doing house work in the house a lot. I wasn't there long, maybe sometimes a half hour and sometimes an hour." On cross examination the witness testified as follows: "Q. Did you actually believe they were married? A. I didn't know whether they were or not; I couldn't tell you that; all I know is they seemed as man and wife to me."

A witness who lived just across the alley from decedent testified as follows: "Q. Did she ever refer to Mr. Biesenbach as her husband? A. Well, I couldn't say I ever heard her or heard either one refer to the other or what they were—I didn't know but what they was married folks; I never inquired about it."

Another witness who lived at 1100 Poplar Street and had known the decedent for many years testified as follows: "Q. Have you heard any conversations

between she and Mr. Biesenbach as to whether they were husband and wife? A. No, I can't say I heard anything with reference to husband and wife. Q. Did she ever call him her husband? A. Not in my presence. Q. What have you seen him do over there? A. I have seen him washing the dishes, scrubbing floors, . . ."

There was further evidence of people living close by that they did not know him by name; that the lady living at 1115 Poplar Street was known as Mrs. Dittman; that on some occasions the lady referred to the man living in the house in an indirect way as her husband.

There was evidence that a renter of property owned by decedent paid her rent during the ten-year period and that he gave the decedent a receipt under the name of "Dittman"; that the decedent stated that she was upset as she wanted to get rid of Herman and was not able to do so, that she was a woman; that she could not throw him out, referring to Mr. Biesenbach; that decedent further said on one occasion that the appellee was like a roomer; that on many occasions when friends and neighbors would come to the house or pass by when decedent would be on the porch to talk with her that the appellee would walk away; that Mr. Biesenbach was not introduced to friends, neighbors or relatives.

Another witness for the appellant testified as follows: "Q. About how long had you known her? A. I would like to tell you how I got acquainted with her. Q. How did you get acquainted with her? A. There was a meat man who had an ad in the paper for meat curing and I had a market on the corner and I was open from 7 in the morning until 9 at night and they wore my door off looking for him and asking me where this meat man was and so I just said, I will find out

where this meat man is and I started out down the street, and knocked on doors and when the people came to the door I asked if they cured meat and they said 'no' and finally I came to 1115 Poplar and a lady came to the door and I said 'Lady, does your husband cure meat?' and she said 'No, my husband is dead, there is a man who rooms here with me that cures meat' . . ."

We do not find evidence of a mutual assent of the parties to become husband and wife. Neither is there evidence of what was said or done, if anything, between the parties to show an intention to create the relationship of husband and wife. Neither do we find evidence that such marriage contract was made by the parties. We deem these elements of such a vital nature to consummate a common-law relationship of husband and wife that they cannot be waived, even though the parties afterwards cohabit together. There is not any evidence that the parties held each other out in the neighborhood where they lived as husband and wife. The fact that "it looked like they were husband and wife" does not make it true. It is a fact that neighbors and friends who had known decedent for many years continued to call her Mrs. Dittman; that the gas meter still remained in her name; that she gave rent receipts under the "Dittman" name; that she expressed the desire to get rid of him; that she said her husband was dead. Such facts are not consistent with a marriage contract or a holding out to the community of such relationship in which they lived. The record is barren as to these parties ever introducing the other as their husband or wife or respectively.

Reputation as proof of such marriage must be uniform and general and not limited to particular persons

or divided in the community in which the parties cohabit in order to suffice as proof of marriage between them. *Clayton* v. *Universal Construction Co.* (1942), 110 Ind. App. 322 (and cases therein cited on page 330) 38 N. E. 2d 887.

The view that cohabitation and reputation are essential to a common-law marriage is based upon the premise that marriage is a status to which mutual consent is essential, consent being the threshold by which such status is reached; but such status is not attained until the parties, either through the medium of ceremonial marriage or by a holding out of themselves as husband and wife, publicly assume such relation. *Topper* v. *Perry* (1906), 197 Mo. 531, 95 S. W. 203, 114 Am. St. Rep. 777. See also 33 A. L. R. 37, 40. This view is further based on the fact that marriage is a contract in which the public is interested and to which the state is a party. *Catlett* v. *Chestnut* (1933), 107 Fla. 498, 146 So. 241, 91 A. L. R. 212.

In the case of *Schilling* v. *Parsons*, Administrator, *supra,* the court said:

> "To hold that a common-law marriage is established without public acknowledgment of the marriage status of the contracting parties where there is an unwitnessed oral agreement, would open the door to perjury and fraud, deny to the parties themselves the protection to which they are each entitled, and jeopardize the sanctity of the basic institution of all civilized society, the home."

The appellee testified as to intimate relations with the decedent undoubtedly for the purpose of proving a common-law relationship. More is required than for the parties themselves to believe that such a relation constitutes a common-law marriage, even though the sexual act may have been performed.

In the case of *Mayes* v. *Mayes* (1925), 84 Ind. App. 90, 147 N. E. 630, the court said:

> " 'A cohabitation illicit in its origin is presumed to be of that character, unless the contrary be proved, and cannot be transformed into matrimony by evidence which falls short of establishing the fact of *an actual contract of marriage.*' " (Our emphasis) " 'Such contract may be proved by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of actual matrimony by mutual contract.' "

Where the cohabitation is shown to have begun meretriciously, the burden is upon the person claiming such marriage to show it independently of such presumption.

Appellee cites the case of *Teter* v. *Teter* (1885), 101 Ind. 129, in which case Mr. Clayton and Mrs. Teter entered into a marriage contract on May 18, 1871, obtained a license and marriage solemnized. Neither of the parties had any idea that there was an impediment to such ceremonial marriage although Clayton had been previously married and believed that such marriage had been dissolved by divorce. The facts were that no divorce had been granted. In that case, the parties lived and cohabited together as husband and wife from the date of marriage until the death of Anna Teter. They were so regarded as husband and wife in the community where they resided. They held themselves out as such. A mortgage was executed by them as husband and wife, a child was born to them who received its father's name and was recognized as a child of lawful wedlock.

In the present case, we do not have evidence of cohabitation as husband and wife or that they regarded

themselves as husband and wife in the community in which they lived; that they ever transacted business as husband and wife or that there was a holding out of such relationship.

In the case of *Teter* v. *Teter, supra,* the court correctly said:

"It is not the formal ceremony that creates the marital relation. If the matrimonial engagement is entered into from pure motives, and the connection is not formed for the purpose of illicit sexual commerce, there may be a valid marriage although there is no formal celebration. *The intention to assume the relation of husband and wife, attended by pure and just motives, and accompanied by an open acknowledgment of that relation, is sufficient to constitute a marriage.*" (Our emphasis)

We believe that the Teter case, *supra,* is authority to the fact that in the instant case there was not any evidence of a sufficient holding out or an open acknowledgment of the relationship of husband and wife in the community to constitute a common-law marriage as is required in the Schilling case, *supra.*

In the case of *In Re Trope's Estate* (1942), 190 Okla. 453, 124 Pac. 2d 733, the plaintiff in error, designating herself as Emma Lamb Trope claimed to be the common-law wife of Isaac Trope, deceased, filed a petition for Letters of Administration upon his estate, but the Supreme Court of Oklahoma, in holding that a common-law marriage did not exist and affirming judgment against her, said:

"The contestant testified that she and the deceased Isaac Trope had entered into a mutual agreement in January, 1911 whereby they then and there agreed to be and become husband and wife and in this she was corroborated by the testimony of a number of witnesses in so far as subsequent habit and reputation of the parties was

concerned. On the other hand we find that by acts and declarations of contestant as well as those of the deceased Isaac Trope the existence of the relation is disputed since it appears that on numerous occasions both parties denied that they had ever been married or that they were living as husband and wife and the evidence conclusively shows that during all of the period which the parties resided together that the contestant retained the name of Emma Lamb and was so listed in the telephone directory and carried her bank account and stock purchases in such name and that even so late as 1935 the parties by written contract made to settle certain differences which had arisen between them therein solemnly declared that their relation was that of employer and employee and had been at all times and was never anything more. Further it appears from the record that the deceased, Isaac Trope, conducted his business as a single man and executed deeds and other instruments and contracts in such capacity and claimed to be such in all tax returns filed by him. In other words under all of the evidence it appears that the testimony relative to habit and repute was to the effect that the reputation of the parties was a divided one."

We believe the existence of a common-law marriage is dependent upon there being a contract of marriage between the parties in words of the present tense; that there must be mutuality to such contract and that the minds of both parties must meet in mutual consent to said marital status.

The mere living together in the ostensible relation of husband and wife does not of itself constitute a marriage. *Balanti* v. *Stineman Coal & Coke Co.* (1938), 131 Pa. Super. 344, 200 A. 236.

Common-law marriages are recognized in Indiana, but since they are a fruitful source of perjury and fraud, they are merely tolerated and are not encouraged. Even if there is a purported contract of common-law marriage, which in this case we

do not find to exist, it must be examined with great scrutiny, and, in order to sustain it, it must plainly appear that there was an actual mutual assent between the parties and a holding out to the public in which they lived. A common-law marriage, such as was sought to be established in this case we believe implies that both parties are able and willing to marry and that they solemnly entered into a contract of marriage in terms of the present tense for the purpose of establishing the immediate relation of husband and wife, and, if any of the essential requirements are lacking as herein pointed out, the relation becomes illicit and meretricious and not a valid common-law marriage. *Baker, Appellant* v. *Mitchell et al.* (1941), 143 Pa. Super. 50, 17 A. 2d 1938.

In the case of *In Re Meredith's Estate* (1937), 279 Mich. 298, 272 N. W. 683, it was held that the showing that a man and woman cohabited together and were known as husband and wife is not alone sufficient to establish common-law marriage, but it must also be shown that there was a present agreement between the man and woman to take each other as husband and wife. That case is much stronger than the one under ·consideration, for that case involved a couple that were known as husband and wife, while in the present one, there is not any evidence that they held themselves out to the community as husband and wife, neither is there evidence of an agreement of a contract.

The case of *Crockett* v. *Consolidated Paper Co.* (1937), 281 Mich. 571, 275 N. W. 253, involved a case where a man and woman were living together illicitly, such a relation continued illicit and the court held that such relation continued illicit although the woman claimed a secret common-law marriage. The court further held that common-law marriage required publicity,

and, therefore, the woman was not related to the man so as to be entitled to claim compensation for his death.

From the evidence and lack of evidence in the present case, this court cannot say from the manner of the daily life of the parties by their conduct, by their demeanor and habits that this man and woman lived together as husband and wife and that there was a mutual relationship entered into between them. *Forshay* v. *Johnston* (1944), 144 Neb. 525, 13 N. W. 2d 873.

The burden rested upon the appellee to establish by a preponderance of evidence of probative value that these parties made and entered into a contract of marriage in words of the present tense, that mutuality existed in this contract and that there was a holding out of such relationship in the community where they lived. Common-law marriages should be recognized with caution by courts and should not receive judicial sanction if the conduct of the parties fails to show clearly an honorable, abiding agreement entered into, and that the same existed before the eyes of the community. *McChesney* v. *Johnson* (1935), (Texas) 79 S. W. 2d 658.

This court has searched the record to determine whether or not there was evidence of probative value according to the rules announced that would establish the main requisites required to constitute such a marriage, and, in view of the evidence and lack of evidence to substantiate the same, we are of the opinion that the decision the court rendered is not sustained by sufficient evidence and is contrary to law.

In view of the conclusion reached, it is not necessary to discuss other assigned errors.

Judgment reversed with instructions to the court to sustain appellant's motion for new trial.

NOTE.—Reported in 115 N. E. 2d 125.