ANDERSON *v.* ANDERSON.

[No. 29,255. Filed January 13, 1956.]

*Lawrence Booram* and *Grace B. DeArmond,* both of Anderson, for appellant.

*Charles B. Salyer* and *Sid M. Cleveland,* both of Anderson, for appellee.

EMMERT, J.—This appeal reaches us by transfer from the Appellate Court for failure of four judges to concur in the result under §4-209, Burns' 1946 Replacement. The judgment appealed from granted an absolute divorce to the appellee, awarded her $2,000 alimony, attorneys' fees, and support for a minor child of the parties. The complaint attempted to allege a common-law marriage, and if the judgment is to be sustained it must be on the assumption there was in fact such a common-law marriage. The assignment of errors alleges the lower court erred in overruling appellant's motion for a new trial.

We have carefully examined the evidence, and when viewed most favorably to appellee, it discloses the following:

Appellee testified she came to Marion, Indiana, from Birmingham, Alabama, about sixteen (16) years ago. She had never been married before she moved to Anderson. While she was at Marion she met the appellant, went with him, and had sexual intercourse with him, but did not live with him while in that city.

She testified that she and the appellant in 1940 came to Anderson to look at a house at 1529 Forkner, which he bought and took the title in his name, and which the parties lived in until the time of trial. She stated "He told me if I come over and lived with him I wouldn't have nothing to worry about. That he would take care of me." They started living together and she "did for him like a wife." While living there, their relations were as "man and wife." She testified, "I wasn't married and he asked me would I come and live with him and I wouldn't have a thing to worry about and we would marry later on and he kept on putting it off." "He didn't never" say when he was going to marry, "He just told me he would do it." About the time they moved to Anderson she stated on the subject of marriage "I didn't ask him no more because he told me he was going to marry me, but he didn't ever do it. He kept on putting it off." He took her on one trip to Chicago, and three or four trips to Terre Haute where they slept together, and he introduced her as Mrs. Anderson. When they first moved to Anderson he introduced her as Mrs. Anderson, and this happened many times. Four or five years before the trial she asked him about obtaining a marriage license and having a preacher marry them "and he said he would do it," but he never did.

In 1950 appellee sued appellant for divorce, but the action was never tried, and a reconciliation was effected with the parties again living together at the same

address. She stated she went back to him "Because he promised me he would do better and go fix everything up."

During part of the time the parties lived together in Anderson she worked and clothed herself. She owned most of the household goods although some had been purchased together. He bought the groceries, claimed her as a dependent wife on his federal income tax returns, and she was listed as his wife in one county tax assessment list. He took out an insurance policy showing her as his wife, but the title to the residence was never changed to vest any interest in her. In 1951 the parties had a child, the birth certificate showing appellant as the father, but it did not show the parties were married or that the child was legitimate. Appellant paid the hospital and medical expenses.

The burden of proving a common-law marriage is on the party asserting and relying upon it. *State ex rel. Schumacher* v. *Adams C. Ct.* (1947), 225 Ind. 200, 204, 73 N. E. 2d 689; *Lowrance* v. *Lowrance* (1932), 95 Ind. App. 345, 355, 182 N. E. 273.

"Marriage is a status resulting from a contract to marry entered into by a man and a woman capable of making such a contract." *Compton* v. *Benham* (1908), 44 Ind. App. 51, 58, 85 N. E. 365, 367. This language was approved in *Bolkovac* v. *State* (1951), 229 Ind. 294, 304, 98 N. E. 2d 250.

Where the relations of the parties are illicit in the beginning, the rule is well settled in Indiana that there must be clear evidence of an actual contract of marriage independent of any presumption before the court will find there was a common-law marriage. "It seems to be well settled in this state, as well as in other jurisdictions, that, although the relations of

the parties were at first illicit, they are not thereby precluded from thereafter contracting a valid common-law marriage. *Mayes* v. *Mayes* (1925), 84 Ind. App. 90, 147 N. E. 630; *Gorden* v. *Gorden* (1918), 283 Ill. 182, 119 N. E. 312; *Robinson* v. *Ruprecht* (1901), 191 Ill. 424, 61 N. E. 631. As was said in *Mayes* v. *Mayes, supra,* 'A cohabitation illicit in its origin is presumed to be of that character, unless the contrary be proved, and cannot be transformed into matrimony by evidence which falls short of establishing the fact of an actual contract of marriage. Such contract may be proved by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of actual matrimony by mutual contract.' Where the cohabitation is shown to have begun meretriciously, the burden is upon the person claiming marriage to show it, independently of presumption. *Gorden* v. *Gorden, supra; Sebree* v. *Sebree* (1920), 293 Ill. 228, 127 N. E. 392." *Lowrance* v. *Lowrance* (1932), 95 Ind. App. 345, 355, 182 N. E. 273.

In 1953 the Appellate Court, in a unanimous opinion by Chief Judge Kendall, made an exhaustive review of the Indiana authorities on common-law marriage, and correctly declared the law as follows:

"To constitute a common-law marriage more is required *than proof of a contract.* Such contract must [p. 201] be acted upon by a holding out of such relationship by the respective parties thereto. [Italics supplied.] In the case of *Schilling* v. *Parsons, Administrator, supra,* the court said:

" 'But where the contract between the parties is oral but not witnessed, even though followed by cohabitation, an additional factor is necessary to establish a common-law marriage. Under such cir-

cumstances there must be *a holding out by the parties of their marriage status to at least such part of the public in the community in which they live as is made up of their acquaintances, neighbors and relatives.'* (Our emphasis) [p. 202]

". . .

"In the case of *Mayes* v. *Mayes* (1925), 84 Ind. App. 90, 147 N. E. 630, the court said:

" ' "A cohabitation illicit in its origin is presumed to be of that character, unless the contrary be proved, and cannot be transformed into matrimony by evidence which falls short of establishing the fact of *an actual contract of marriage*." ' (Our emphasis.) ' "Such contract may be proved by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of actual matrimony by mutual contract." '

"Where the cohabitation is shown to have begun meretriciously, the burden is upon the person claiming such marriage to show it independently of such presumption. [p. 207.]

". . .

"*We believe the existence of a common-law marriage is dependent upon there being a contract of marriage between the parties in words of the present tense; that there must be mutuality to such contract and that the minds of both parties must meet in mutual consent to said marital status.* [Italics supplied.]

"The mere living together in the ostensible relation of husband and wife does not of itself constitute a marriage. *Balanti* v. *Stineman Coal & Coke Co.* 1938, 131 Pa. Super. 344, 200 A. 236.

"Common-law marriages are recognized in Indiana, but since they are a fruitful source of perjury and

fraud, they are merely tolerated and are not encouraged. Even if there is a purported contract of common-law marriage, which in this case we [p. 209] do not find to exist, *it must be examined with great scrutiny, and, in order to sustain it, it must plainly appear that there was an actual mutual assent between the parties* and a holding out to the public in which they lived. A common-law marriage, such as was sought to be established in this case we believe implies that both parties are able and willing to marry *and that they solemnly enter into a contract of marriage in terms of the present tense for the purpose of establishing the immediate relation of husband and wife,* and, if any of the essential requirements are lacking as herein pointed out, the relation becomes illicit and meretricious and not a valid common-law marriage. *Baker, Appellant* v. *Mitchell et al.* (1941), 143 Pa. Super. 50, 17 A. 2nd 1938. [Italics supplied.]

"In the case of *In Re Meredith's Estate* (1937), 279 Mich. 298, 272 N. W. 683, it was held that the showing that a man and woman cohabited together and were known as husband and wife is not alone sufficient to establish common-law marriage, but it must also be shown that there was a present agreement between the man and woman to take each other as husband and wife." [p. 210.] *Estate of Dittman* v. *Biesenbach, Admr. etc.* (1953), 124 Ind. App. 198, 115 N. E. 2d 125.

As noted in the Dittman case, supra, there must be a contract, and it must arise from words in the present tense. This is in accord with the general law of other jurisdictions. "With regard to common-law marriages effected by the express agreement of the parties, a distinction is made between contracts per verba de praesenti, that is, where the parties take each other in the

present tense, implying that the marital relation is constituted immediately, and contracts per verba de futuro, which imply no more than that the parties will marry each other at a later time. Contracts of the former sort, when duly acted up, create a valid marriage, while words evidencing only the intention to be married in futuro are ineffectual even where followed by cohabitation." 38 C. J. 1319, §94. See also 55 C. J. S. 847, §20.

A contract by words in the present tense, or per verba de praesenti as the books express it, to be married or to be husband and wife, to comply with the well settled law on the subject must, of necessity, be an express contract, although it need not be in writing, and need not be in any particular words. It cannot be an implied contract, such as the law raises in the case of quasi contracts or in actions of assumpsit. An express contract can only be created by an offer and acceptance. There must be words to create an offer although the acceptance can be made by either words or acts, according to the terms of the offer. The parties must be competent to enter into the contract, and if one of them be married at the time, no contract can be made and no common-law marriage can be effected any more than a ceremonial marriage could be created. Cohabitation of itself cannot constitute a contract, *Dunlop* v. *Dunlop* (1935), 101 Ind. App. 43, 50, 198 N. E. 95. The law prohibits cohabitation without marriage. Section 10-4207, Burns' 1942 Replacement.[2] Cohabitation, reputation, or other conduct may corroborate evidence that there was a contract, or in the absence of testimony by one of the parties as to what the agreement was, if

---

2. "Whoever cohabits with another in a state of adultery or fornication shall be fined not exceeding five hundred dollars ($500), or imprisoned in the county jail not exceeding six (6) months, or both." Section 10-4207, Burns' 1942 Replacement.

any, it might, in a strong case, be sufficient to draw the inference that there was a contract to marry in the present tense, but the contract must be formed by what was said and done by the parties, and when the testimony of the party asserting and relying upon the contract discloses there was no language in the present tense constituting a contract to marry, then cohabitation, reputation and other conduct cannot constitute words which were never spoken or used.

Even where there is evidence of an oral contract not witnessed, our courts have made additional requirements to establish the validity of a common-law ▪ marriage. "But where the contract between the parties is oral but not witnessed, even though followed by cohabitation, an additional factor is necessary to establish a common-law marriage. Under such circumstances there must be a holding out by the parties of their marriage status to at least such part of the public in the community in which they live as is made up of their acquaintances, neighbors and relatives." *Schilling* v. *Parsons, Admr.* (1941), 110 Ind. App. 52, 58, 36 N. E. 2d 958. See also *In Re Lambert's Estate* (1945), 116 Ind. App. 293, 302, 62 N. E. 2d 871.

The complaint in this case did not allege that there was any contract of marriage per verba de praesenti,[3] and the evidence when viewed in favor of the ▪ appellee, with all reasonable inferences that could be drawn therefrom, fails to show such a contract. *Moreover, the testimony of the appellee herself, who would be presumed to state the case as*

---

3. "That the parties have since December 9, 1940 lived as husband and wife but were never married through a license but that they have held themselves out as legally married, man and wife, and have had, through this bond of matrimony, a child born. . . ." Complaint filed November 14, 1953.

*favorably as she could to maintain the alleged marriage,
affirmatively proved there never was a contract in the
present tense to be married.* In fact, her testimony
merely corroborated that of the appellant, who in sub-
stance testified the reason he never would agree to
marry her was that she had been married in Birming-
ham and never divorced, that she went there to get a
divorce and came back and told him she had obtained
a divorce, which he did not believe since she had only
been in Birmingham three days, and he was smart
enough to know she could not get a divorce in three
days. No inference can be drawn against the appellant
because he did not defend the interlocutory order in the
first divorce suit on the ground there had been no com-
mon-law marriage. It is well settled that the merits of
the divorce action are not in issue in a hearing for
support pending the action, and any attempt to deny
the marriage would have been fruitless. *Argiroff* v.
*Argiroff* (1939), 215 Ind. 297, 19 N. E. 2d 560. Appellee
admitted the relationship was illicit in its inception
when they knew each other in Marion, and the presump-
tion is that this relationship continued illicit. To over-
come this presumption the evidence must clearly estab-.
lish the fact of a subsequent actual contract of mar-
riage. *Estate of Dittman* v. *Biesenbach, Admr. etc.*
(1953), 124 Ind. App. 198, 115 N. E. 2d 125, *supra,*
and authorities therein cited. Cohabitation, reputation,
tax returns, insurance provisions, and the birth of a
child do not constitute a contract of marriage per
verba de praesenti.

There is no occasion to further liberalize the law of
this state in favor of common-law marriages. We are
not living in a frontier society[4] and there is no hardship

---

4. The lack of satisfactory marriage records in Washington
County, Kentucky, was responsible for circulation of the story

on anyone in obtaining a license and having a ceremonial marriage which becomes of record for their protection and the protection of their children. There is always danger of fraud being perpetrated upon the living and the dead as well as employers and their insurance carriers. Common-law marriages have been outlawed in England since 1753, and thirty (30) states now hold such marriages invalid. Keezer, Marriage & Divorce (3rd Ed.) §28. Such marriages permit the parties to circumvent the statutory requirements for a blood test (§44-213, Burns' 1952 Replacement) which were designed for the protection of the parties and to prevent the iniquities of the fathers from being visited upon the children even to the fourth generation. It is regrettable that the parties had a child born out of wedlock, but this court does not sit as the General Assembly to legitimize all children born under such circumstances. Nor does this court have any right to nullify §10-4207, Burns' 1942 Replacement, which prohibits cohabitation in a state of adultery or fornication, by holding such evidence as here reviewed constituted a common-law marriage. This record affirmatively discloses there was no contract of common-law marriage.

Since there was no common-law marriage, there could be no divorce, and it is not necessary to consider other contentions raised by appellant.

Judgment reversed and new trial ordered.

---

that Lincoln's father and mother were never legally married. The marriage papers were not discovered until about 1882. Jesse Head, a Deacon of the Methodist Episcopal Church of Kentucky, on April 22, 1807, made a return of sixteen marriages from April 28, 1806, to the time of the return. The ninth marriage disclosed Thomas Lincoln and Nancy Hanks were married by him June 12, 1806. Dr. Louis A. Warren's "Lincoln's Parentage and Childhood" (1926), pp. 69, 307.

126 

Bobbitt, C. J., Landis, Achor and Arterburn, JJ., concur.

NOTE.—Reported in 131 N. E. 2d 301.