UNITED STATES STEEL CORP. *v.* WEATHERTON

[No. 18,677.   Filed January 23, 1956.]

*Stevenson, Conaghan, Velde & Hackbert,* of Chicago, Illinois, *White, Raub, Craig & Forrey,* of Indianapolis, and *Harlan L. Hackbert* and *George C. Forrey* (of counsel), for appellant.

*Strom & Whitted,* and *Oscar Strom* (of counsel), of Gary, for appellee.

PFAFF, P. J.—This is an appeal by the appellant United States Steel Corporation from an award of the Full Industrial Board of Indiana under the Workmen's Compensation Act. The proceedings before the single member of the Board had been instituted by Benjamin Weatherton in his lifetime. While his claim was pending before the Full Board for the taking of additional medical evidence, Benjamin Weatherton died of causes not related to the alleged accidental injury.

After a hearing on defendant's special answer that the claim had hereby abated, to-wit: That Benjamin Weatherton, appellee's decedent herein, died July 26, 1953, of causes other than the injury complained of: arteriosclerotic heart disease, leaving no dependents as defined in Sec. 38 of the Workmen's Compensation Act of Indiana. The appellee filed her petition to be substituted as party plaintiff, and dependent, Leita Mae Frances Weatherton, claiming to be the lawful wife of Benjamin Weatherton, was substituted as the claimant.

The application for compensation was originally filed on August 10, 1951, and finally resulted in a finding by a majority of the Full Board that Benjamin Weatherton

had sustained a 15% permanent partial impairment. We quote from the pertinent portion of the award as follows:

"That Benjamin Weatherton, plaintiff's decedent, died on the 26th day of July, 1953 of arteriosclerotic heart disease, which said disease was wholly unrelated to his employment with the defendant herein; that he left surviving him as his sole and only dependent, Leita Mae Frances Weatherton, his common law widow, and with whom he entered into a common law relationship which had existed openly and notoriously for a period of more than five (5) years immediately preceding the said accidental injury of Benjamin Weatherton, deceased, on March 12, 1950."

Under proper assignment of error appellant contends (1) that the present plaintiff was not the lawful common law wife of the decedent at the time of his death; (2) that there was no proof to a reasonable degree of medical certainty that any condition of the decedent's hands was the result of his employment; and (3) that any claim for compensation was barred by the statute of limitations. In view of the conclusions we have reached it is only necessary to consider whether or not appellee was the common law wife of decedent.

In view of the fact that there has arisen a great deal of dispute as to what constituted common law marriage, it is pertinent to a decision in this case to quote evidence from the transcript.

Leita Mae Frances Weatherton, appellee, met the decedent, Benjamin Weatherton, some time in 1936 while he was working as an engineer for the American Bridge Company on the Oakland Bay bridge in the city of San Francisco, California, at which time he asked her to come and live with him as he needed someone to care for his apartment. They held themselves out to the

public as husband and wife after living together for a while, continuing to do so until 1939.

Q. Now did you then go together as sweethearts or companions after you first met him, when you first met him?

A. No.

Q. Did you and Ben at any time live together?

A. Yes.

Q. And when did you begin living together?

A. In San Francisco.

Q. When was it, about?

A. In the year of 1936, I think, I don't remember the exact date.

Q. In the year of 1936?

A. Yes.

Q. Who suggested that you and he begin living together?

A. No one.

Q. You didn't begin living together without talking about it?

A. He needed someone to take care of his apartment.

Q. Did he ask you to come and live with him?

A. He asked me, yes.

Q. You and he began living together, you held yourselves out as husband and wife, after living together a while, that right?

A. Yes.

Q. Mr. Weatherton introduced you as his wife?

A. Yes.

Q. And you introduced him to people as your husband?

A. Yes.


DIRECT EXAMINATION OF APPELLEE
CROSS-EXAMINATION OF APPELLEE

Q. You first knew Mr. Weatherton in San Francisco in 1936, that right?

A.  Yes sir.

Q.  How long had you known him before you and he started living together?

A.  How long had I known him?

Q.  Yes, how long?

A.  Just a short time.

Q.  In weeks or months?

A.  About two months, to be exact.

Q.  At that time how old were you?

A.  That was in 1936, I am 41 now.

Q.  Twenty-four?

A.  Yes sir.

Q.  Prior to that time had you been living and working in San Francisco?

A.  No, I had only come to San Francisco, only lived there a short time, I lived in Los Angeles.

Q.  Now where did you and Mr. Weatherton first live together, what was the address, if you know?

A.  I think it was Heigh Street, I don't remember the number in San Francisco.

Q.  Did you know there is no common law marriage in California?

A.  I wasn't sure, I was told there was and told there wasn't.

Q.  Speaking about California?

A.  Yes sir.

Q.  At the time you went to live with Mr. Weatherton what, if anything, did you know about common law marriages in California?

A.  I didn't know anything about it.

Q.  And you lived together in California for how long?

A.  From 1936 up until, I think just before the bridge was completed in 1939, I know the bridge was opened in 1939, I think we were sent away before the bridge was opened.

In 1939 the decedent was transferred by the American Bridge Company to Duluth, Minnesota, where the parties remained until the end of 1940. While living

in the state of Minnesota, they lived together and held themselves out to the public as husband and wife.

## DIRECT EXAMINATION OF APPELLEE

Q. Now did you go with him to Minnesota?

A. Yes, I did.

Q. You and he made the trip together?

A. Yes, we did.

Q. Who paid your fare for you to go from San Francisco to Minnesota?

A. We went by car, Mr. Weatherton paid the fare.

Q. When you got to Minnesota what town did you first settle in?

A. Duluth, Minnesota.

Q. And you and Ben were holding yourselves out as married at that time?

A. Yes sir.

## CROSS-EXAMINATION OF APPELLEE

Q. You recall you went to Minnesota in November of 1936?

A. No sir—1939.

Q. Now, after you went to Minnesota there was no marriage ceremony performed there?

A. No sir.

Q. You didn't take out any marriage license there?

A. No.

Q. I assume from the time you first started living with Mr. Weatherton and taking his name there was never any change in your relationship after that, I mean by that you never had any marriage ceremony performed afterwards?

A. No.

Q. Never took out a marriage license?

A. No.

Q. Never had any further discussion or any new arrangements or anything like that?

A. No.

After leaving Minnesota, the appellee and decedent moved to Salisbury, Pennsylvania, where Weatherton worked for the American Bridge Company for several months, continuing to hold themselves out as husband and wife. From Pennsylvania the company sent the decedent to Dearborn, Michigan, where he worked for about a year and a half at the Ford plant. They owned a trailer and lived as man and wife.

### DIRECT EXAMINATION OF APPELLEE

Q. And did you further live together in Detroit, Michigan?

A. Yes, we did.

Q. What kind of place did you live in, an apartment or house?

A. We owned a trailer, located the equipment on a trailer camp.

Q. And you lived together as husband and wife there?

A. That's right.

Q. He would hold you out as his wife?

A. We did.

Q. And you would hold him out as your husband?

A. That's right.

### CROSS-EXAMINATION OF APPELLEE

Q. When was it the people had those talks with you?

A. Well, when we were in Minnesota, Ben asked about it in Minnesota when we were living there, he came home and told me they recognized it there. We didn't talk about it no more, then we

came to Michigan, I asked several women and some said no, I have always been very confused, I really never asked a lawyer until I came to Gary just recently.

Q. So that from the time you were living in Minnesota, where you went in 1939, you and he had some doubts?

A. Not in Minnesota, they told him it was all right, he asked some men on the job, they said it was recognized there.

Q. He came home and told you common law marriages were recognized in Minnesota?

A. Yes, we discussed it.

Q. After you went to Michigan did you discuss the matter with some friends there?

A. Yes sir.

Q. Discussed it also with people here in Indiana?

A. Yes sir.

In the latter part of 1946 or in the early part of 1947 appellee and decedent moved to Gary, Indiana, where they bought a home and lived as man and wife until 1950 when they moved to Chicago, Illinois.

## DIRECT EXAMINATION OF APPELLEE

Q. If you came to Gary, in 1947, that you came to Michigan about 1945 and to Indiana about the end of 1946?

A. I know we bought property in Gary in 1947, it must have been along the last part of 1946 that is to the best of my recollection.

Q. And now you moved to Gary, Indiana, the latter part of 1946 and bought property here in Gary?

A. Yes.

Q. So you said at that time you were his house-keeper?

A. Yes sir.

Q.   At that time you were living in Ben's home and you treated him when he was injured?

A.   Yes sir.

The record indicates that appellee's decedent named appellee as beneficiary in two insurance policies but that the name of the beneficiary was changed by the appellee.

## DIRECT EXAMINATION OF APPELLEE

Q.   Now Mrs. Weatherton I hand you what has been designated as Petitioner's Exhibit No. 3 and ask you what that purports to be?

A.   This is supposed to be a Group Insurance Policy for the older men of the company.

Q.   What Company?

A.   American Bridge Company.

Q.   Now on that Exhibit there is a typewritten name of the beneficiary, as being who originally?

A.   Leita Mae Francis Weatherton, wife.

Q.   The 'Weatherton and wife' is stricken out and the word 'friend' is written in, who wrote that in?

A.   I did.

Q.   And when did you do that?

A.   I think I was in Michigan at that time.

Q.   And I hand you what has been marked as Petitioner's Exhibit No. 4 and ask you what that purports to be?

A.   This is when they added—placed my name on it.

Q.   Just what is it?

A.   Policy of Insurance, the same Insurance.

Q.   Issued by whom?

A.   Benjamin Weatherton.

Q.   Issued to Benjamin Weatherton?

A.   Yes.

Q.   I notice it is for how much, Six thousand

dollars, issued by whom, The American Bridge Company?

A. The American Bridge Company.

Q. And this Exhibit No. 3, was it issued by the American Bridge Company?

A. The American Bridge Company.

Q. This policy, Petitioner's Exhibit No. 4, didn't they issue that?

A. Yes, to Leita Weatherton, wife.

Q. I notice 'Weatherton, wife' is stricken out and 'Francis' and 'Friend' are added, who did that?

A. I did.

Q. When did you do that?

A. Since I was in Indiana.

Q. Now what was your reason for changing the words on the face from Leita Mae Francis Weatherton, wife and putting Leita Mae Francis, friend in Petitioner's Exhibit No. 3?

A. Because they kept telling me there was no such thing.

Q. No such thing, what?

A. Common law wife.

Q. You believed the policy would be invalid even if Ben did hold you out as his common law wife, that's it?

A. Yes sir.

Q. Now what about Petitioner's Exhibit No. 4, with the beneficiary Leita Weatherton, wife, what was the reason for changing that to Leita Francis, friend?

A. I was confused, some people told me there was no such thing and some told me there was, I thought the company would let me know if I sent it in, they would write me a letter.

Q. Who do you mean?

A. The people I talked to.

Q. What did they say?

A. Some said the state recognized it, other said it didn't.

Q. Recognized what?

A. Common law wife.

Q. You were concerned that the policies might not be effective in the event they were issued to a common law wife?

A. Yes sir.

Q. Did you know at that time a common law marriage wasn't recognized in California?

A. I didn't know.

CROSS-EXAMINATION OF APPELLEE

Q. So when the changes were made on the face of those Certificates, you were the one that made the changes?

A. Yes sir.

Q. You made one change while living in Michigan and the other change after you were living in Indiana, that right?

A. The best that I can remember.

Q. You did that, changed the policies those times because you had some doubt in your own mind that you were his legal wife?

A. I was told by some I was, others told me different, I didn't know.

Q. That same doubt was present at the time you testified in this case before, when you testified you were his housekeeper?

A. Yes, I didn't know until I asked the lawyer, we had heard some say 'yes' and some say 'no'.

Q. When was it you first had those doubts?

A. Because some people told us yes the state recognized it, others said no.

The appellant contends that a common law marriage relationship commenced in the state of California was invalid and illicit and that in the absence of a new agreement of marriage in terms of the present tense the parties' subsequent living together in states where

common law marriages are recognized did not validate a relationship illicit in its inception; that cohabitation, illicit in its origin, is presumed to continue to be illicit and cannot be transformed into matrimony by evidence which falls short of establishing the fact of a subsequent actual contract of marriage. The appellee recites that she and the decedent maintained a common law relationship of husband and wife within the state of Indiana for more than five (5) years. Citing Burns' Ind. Stat., 1952 Repl., Sec. 40-1403A, and that the facts in this case satisfactorily proved that any former illicit relationship in California "had been changed into that of actual matrimony by mutual assent".

All the parties to this appeal agree that the marriage contract entered into between appellee and decedent in 1936 was invalid under the laws of the state of California. *Norman* v. *Norman* (1898), 121 Calif. 620, 54 Pac. 143; *Taylor* v. *Industrial Accident Commission* (1933), 141 Calif. App. 461, 21 Pac. 2d 619.

The question of what constituted a common-law marriage has been a matter of serious concern to our courts for many years. In order that such marriage may not be used as a vehicle to undermine and destroy the sanctity of the home, courts have prescribed certain rules of evidence to establish such relationship.

On the authority of the case of *Anderson* v. *Anderson*, — Ind. —, 131 N. E. 2d 301, decided January 13, 1956 and the cases therein cited by our Supreme Court, we hold the evidence in the record in this case wholly fails to establish the existence of common law marriage between the appellees and decedent.

Award reversed.

NOTE.—Reported in 131 N. E. 2d 335.