Laurel GLASGO, Defendant–Appellant,

v.

Jane C. GLASGO, Plaintiff–Appellee.

No. 1–380A62.

Court of Appeals of Indiana,
First District.

Sept. 29, 1980.

Rehearing Denied Nov. 3, 1980.

Brent Westerfeld, Indianapolis, for defendant–appellant.

Mark Peden, Foley, Foley & Peden, Martinsville, Steven L. Harris, Harris & Currens, Mooresville, for plaintiff–appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Defendant–appellant, Laurel Glasgo, appeals from a judgment in favor of plaintiff–appellee, Jane Glasgo, for the sum of $6,062.03 and a hutch or for $8,062.03 without the hutch. We affirm.

## FACTS OF THE CASE

Laurel and Jane were married from June 1956 until September 1967 during which time Jane worked outside, as well as within, their home to put Laurel through college

and veterinarian school and during which time two sons were born to them. After the divorce Jane and the boys moved to Arkansas. Laurel remained in Indiana, remarried, but subsequently was divorced. In December 1972 Laurel sought a reconciliation with Jane, and in August 1973, after selling her home in Arkansas, Jane and the children moved back to Indiana to make their home with Laurel. They lived together as a family from August 1973 until August 1978 when Jane and the boys moved out of the home which they had helped the appellant construct on real estate owned by him. Financing for the construction of the home had come from the children's insurance policies and appellant's personal loan and earnings. The parties acquired other household property either jointly or in their separate names. Jane stated that she believed marriage would result upon reconciliation and attempted to convince Laurel approximately every six months that the legal aspect of remarriage was necessary for her security and the children's benefit. Laurel rebuffed her efforts in this direction, saying "what is mine is yours" (transcript, p. 164), "that everything we had was mine is yours" (transcript p. 104), and "we had built it together" (transcript, p. 105). In May 1978 Laurel announced to Jane that a nineteen–year–old girl was pregnant by him and that he guessed he would have to marry her. Jane and the children moved out of the house in August 1978. Jane took the furniture and personal items she had brought from Arkansas, a microwave oven, sweeper, and hutch built by Laurel and a son and which she had finished. Laurel continued to live in the house and remarried. He rejected Jane's requests for a settlement involving property which the parties had accumulated or for services she had rendered from 1973 to 1978. Jane brought the instant action seeking $25,000.00, which was one–half the value of what she believed the house to be worth, based upon their oral agreement that the assets which they were accumulating were owned equally. Laurel moved to dismiss Jane's complaint pursuant to Ind. Rules of Procedure, Trial Rule 12(B)(6). Trial to the court resulted in the following findings and judgment:

"The parties, having tried and argued the above captioned case to the Court, and the Court having had the case under advisement for briefing and argument, hereby finds as follows:

"1. The Defendant's Motion to Dismiss heretofore filed should be denied.

"2. The plaintiff lived and cohabited together with the defendant for the period of August 1, 1973 until August 5, 1978 and on August 5, 1978, she was forty–one (41) years old. During the course of period that the parties lived and cohabited together, they accumulated certain property which equity and contract dictates should be divided.

"3. During the course of the cohabitation, the parties accumulated real estate with a value of Thirty Eight Thousand Eight Hundred and Fifteen Dollars and Sixty Cents ($38,815.60). The real estate was improved upon land owned by the defendant prior to August 1, 1973 and which, on August 5, 1978 had a fair market value of Ten Thousand Dollars ($10,000.00). The real estate on August 5, 1978 was subject to a mortgage in the amount of Five Thousand Three Hundred Sixty–Two Dollars and Seventy Cents ($5,362.70); thus, the equity value in the real estate accumulated during the above mentioned period was Twenty–Three Thousand Four Hundred Fifty–Two Dollars and Ninety Cents ($23,452.90). During the above mentioned period, the parties accumulated certain radio and airplane equipment in the value of Two Thousand Dollars ($2,000.00) and other miscellaneous personal property in the amount of One Thousand Dollars ($1,000.00). An automobile was purchased during that time but is subject to a mortgage more than its fair market value. During that time, a motorcycle was purchased for the fair market value of Two Thousand Five Hundred Dollars ($2,500.00) based upon the value of a trade–in for that motorcycle. The net equity estate of the parties is Twenty–Eight Thousand Nine Hundred Fifty–

Two Dollars and Ninety Cents ($28,-952.90). Further, the plaintiff has in her possession a hutch constructed by the parties whose personal value to the parties is basically due to their contributions to the construction of the hutch and the Court determines that the value of the hutch is Two Thousand Dollars ($2,000.00).

"4. Considering the above assets and the consepts [sic] of equity and implied contract, the Court hereby finds as follows:

"1. The parties lived together subsequent to a divorce for the period of August 1, 1973 to August 5, 1978 and equity should provide a division of the above mentioned property and the property shall be divided as follows:

"The defendant, Laurel Glasco [sic], shall pay the plaintiff the sum of Six Thousand and Sixty–Two Dollars and Three Cents ($6,062.03) and not receive the hutch or, in the alternative, the defendant, Laurel Glasco [sic], shall pay the plaintiff, Jane C. Glasco [sic], the sum of Eight Thousand Sixty–Two Dollars and Three Cents ($8,062.03) and receive the hutch from her."

## ISSUES

Appellant raises two questions for our consideration:

(1) Did the trial court err in failing to grant his motion to dismiss for failure to state a claim upon which relief could be granted? and,

(2) Was there sufficient evidence to support the trial court's judgment?

## DECISION

*Issue One*

Laurel argues that the trial court erred in failing to dismiss Jane's cause because she

presents an unenforceable claim in Indiana. He contends that claims by nonmarried cohabitants are against public policy in Indiana since the legislature has prohibited common law marriages, citing Ind.Code 31–1–6–1.[1] Laurel states that judicial recognition of Jane's claim permits her to accomplish indirectly what she is prohibited from accomplishing directly and in effect reinstates common law marriages in Indiana.

Jane states that she is not asking to be declared a common law wife, but seeks only to protect her contract rights. She points out that what at one time was considered an illegal relationship precluding recovery in cases such as hers has come to be recognized as a common occurrence in our society and no longer precludes courts from responding realistically in such disputes.

■ We agree with Jane. Her complaint may not be a model upon which to assert a contract action, but she does not seek relief upon impermissible grounds. The granting of a motion to dismiss for failure to state a claim upon which relief can be granted is appropriate only where there is no possible set of facts upon which complainant could recover under the allegations stated. *State v. Rankin*, (1973) 260 Ind. 228, 294 N.E.2d 604, *aff'd* 160 Ind.App. 703, 313 N.E.2d 705 (1974); *State Farm Mutual Auto. Insur. Co. v. Shuman*, (1977) Ind.App., 370 N.E.2d 941, *transfer denied; Cochran v. Hallagan*, (1980) Ind.App., 409 N.E.2d 701. Jane's claim invoked both contractual and equitable grounds upon which the court could, and ultimately did, afford her relief. Jane did not seek social security benefits or recovery under the laws of intestate succession. Unlike the celebrated *Marvin* case,[2] there are no support or maintenance payments ("palimony") involved here. Jane did not request, nor did the court grant her, relief

---

1. IC 31–1–6–1 provides: "All marriages known as common–law marriages entered into subsequent to January 1, 1958 shall be and the same are hereby declared null and void."

2. *Marvin v. Marvin*, (1976) 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106. For cases which reach results similar to *Marvin* but have not

received similar publicity, *see, Tyranski v. Piggins*, (1973) 44 Mich.App. 570, 205 N.W.2d 595; *Latham v. Latham*, (1976) 274 Or. 421, 547 P.2d 144; *Carlson v. Olson*, (1977) Minn., 256 N.W.2d 249; *Kozlowski v. Kozlowski*, (1979) 80 N.J. 378, 403 A.2d 902.

based upon the dissolution of marriage statutes. Not all of the parties' property was divided by the court; only a division of specific jointly acquired property about which the parties could not agree is effected by the court's judgment and order. There is no contention by Laurel, and we do not find, that the award of $8,062.03 is outrageous or excessive where the court found the net equity estate attributable to the combined efforts of the parties to be $28,952.90.

Laurel bases his argument that the trial court's decision is contrary to law on the Illinois case of *Hewitt v. Hewitt,* (1979) 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204, which held that recognition of claims such as Jane's was contrary to the public policy of that state. In *Hewitt* the trial court had dismissed a woman's complaint for divorce, child support, and property division on the grounds that the parties lacked a valid marriage. The facts revealed that the parties had begun cohabiting more than fifteen years earlier while college students. When plaintiff became pregnant, defendant told her that they were husband and wife and that no formal ceremony was necessary. They announced their "marriage" to their respective parents and conducted themselves from that time as husband and wife, producing three children and living an outwardly conventional family life. In reliance upon defendant's promises to " 'share his life, his future, his earnings, and his property' with her," plaintiff devoted her efforts to his education and establishment in the profession of pedodontia, obtaining financial assistance from her parents for this purpose and assisting him in his practice. 31 Ill.Dec. at 828, 394 N.E.2d at 1205. The payroll checks which she earned were deposited in the common family fund. At the time of plaintiff's action defendant earned over $80,000 per year and had accumulated large amounts of property, which he owned either jointly with her or separately. The appellate court reversed the trial court's dismissal at 62 Ill.App.3d 861, 20 Ill.Dec. 476, 380 N.E.2d 454, largely employing the reasoning of the California Supreme Court in the *Marvin* case. In *Marvin*

plaintiff and defendant had lived together for seven years in California, a community property state. All property was acquired in defendant's name. Plaintiff contended that she had given up her career in order to provide homemaker's services to defendant and sought half of the property which the parties had accumulated as well as support payments. The California Supreme Court agreed that plaintiff had a right to have her claim heard and stated:

"We conclude: (1) The provisions of the Family Law Act do not govern the distribution of property acquired during a nonmarital relationship; such a relationship remains subject solely to judicial decision. (2) The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. (3) In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case."

134 Cal.Rptr. 815, 557 P.2d 106 at 110.

The Illinois Supreme Court, however, reversed the appellate court and reinstated the lower court's dismissal on the basis of public policy considerations specifically pertinent in the state of Illinois. In doing so it made observations similar to those in *Marvin* :

"[W]e are aware, of course, of the increasing judicial attention given the individual claims of unmarried cohabitants to jointly accumulated property, and the fact that the majority of courts considering the question have recognized an equitable or contractual basis for implementing the reasonable expectations of the parties unless sexual services were the explicit consideration. (See cases collected in Annot., 31 A.L.R.2d 1255 (1953) and

A.L.R.2d Later Case Service supplementing vols. 25 to 31.)"

*Hewitt v. Hewitt*, 31 Ill.Dec. at 830, 394 N.E.2d at 1207. The court also said:

> "It is true, of course, that cohabitation by the parties may not prevent them from forming valid contracts about independent matters, for which it is said the sexual relations do not form part of the consideration. (Restatement of Contracts secs. 589, 597 (1932); 6A Corbin, Contracts sec. 1476 (1962).) Those courts which allow recovery generally have relied on this principle to reduce the scope of the rule of illegality."

*Id.* 31 Ill.Dec. at 831, 394 N.E.2d at 1208.

The real issue in plaintiff's complaint for the Illinois court, however, was that of the relationship of the judiciary to the legislature with regard to public policy questions. The court observed not only that Illinois had abolished common law marriages as far back as 1905, but also that Illinois is one of three jurisdictions retaining fault grounds for dissolution of marriage. The court also noted that during the time that *Marvin* was being decided and given wide-spread publicity the Illinois legislature had adopted the civil law concept of the putative spouse[3] but had expressly excluded common law marriages which result upon knowledge of the defect in the ceremony. Unlike the California court in *Marvin*, the Illinois court in *Hewitt* felt judicial policy making in this area to be inappropriate in light of the "recent and unmistakeable legislative judgment disfavoring the grant of mutual property rights to knowingly unmarried cohabitants." *Id.* 31 Ill.Dec. at 833, 394 N.E.2d at 1210. Moreover, the court felt strongly that relief under the facts of its case would have the practical effect of reinstating common law marriage in Illinois.

We devote a large part of our discussion to this case not only because it is well-reasoned and well-written, but also to distinguish it from the case at bar. We reject the results, however, as unduly harsh and unnecessary. We, like the Illinois court, have wrestled with the larger issues involved in cases such as these. We are bothered by the same searing questions, which the Illinois court raises:

> "Will the fact that legal rights closely resembling those arising from conventional marriages can be acquired by those who deliberately choose to enter into what have heretofore been commonly referred to as 'illicit' or 'meretricious' relationships encourage formation of such relationships and weakened marriage as the foundation of our family–based society? In the event of death shall the survivor have the status of a surviving spouse for purposes of inheritance, wrongful death actions, workmen's compensation, etc.? And still more importantly: what of the children born of such relationships? What are their support and inheritance rights and by what standards are custody questions resolved? What of the sociological and psychological effects upon them of that type of environment? Does not the recognition of legally enforceable property and custody rights emanating from non–marital cohabitation in practical effect equate with the legalization of common law marriage—at least in the circumstances of this case? And, in summary, have the increasing numbers of unmarried cohabitants and changing mores of our society (Bruch, *Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services*, 10 Fam.L.Q. 101, 102–03 (1976); Nielson, *In re Cary: A Judicial Recognition of Illicit Cohabitation*, 25 Hastings L.J. 1226 (1974)) reached the point at which the general welfare of the citizens of this State is best served by a return to something resembling the judicially created common law marriage our legislature outlawed in 1905?"

*Hewitt v. Hewitt*, 31 Ill.Dec. at 830–831, 394 N.E.2d at 1207–08.

---

**3.** A putative spouse is one who "goes through a marriage ceremony and cohabits with another in the good–faith belief that he is validly married." 31 Ill.Dec. at 833, 394 N.E.2d at 1210. *See also, Reger v. Reger*, (1961) 242 Ind. 302, 117 N.E.2d 901, *reh. den.* 178 N.E.2d 749.

Unlike the Illinois court, however, we are not convinced that the impact of the recognition of relationships such as the Hewitts' or the Glasgos' upon our society and the institution of marriage to be of greater importance than the rights of the immediate parties. The strength and endurance of the Anglo–American judicial system has been in just this characteristic, *viz.*, its flexibility as a court of equity to afford and shape individualized relief in the interest of justice when a court of law could not. Therefore, whether or not the common law marriage concept would have been applicable in this case absent its legislated demise has little relevance. As pointed out by the Minnesota Supreme Court, legislative abolition of the common law marriage doctrine has obviously not eliminated the institution, but only the rules which apply to it. *Carlson v. Olson, supra*, fn. 2. In the absence of this doctrine courts have applied other traditional common law and equitable principles. *Id.*; Bruch, *Property Rights of the De Facto Spouses Including Thoughts on the Value of Homemakers' Services*, 10 Fam. L.Q. 101 (1976). Indiana courts have made use of these same principles prior to 1958 when common law marriage was a viable legal doctrine but for some reason was not applied. *See, e.g., Moslander v. Moslander's Estate*, (1941) 110 Ind.App. 122, 38 N.E.2d 268; *Sclamberg v. Sclamberg*, (1942) 220 Ind. 209, 41 N.E.2d 801. We do not find that recognition of a claim for a declaration of property rights in specific property to be a claim which reinstates common law marriages. We remind ourselves, moreover, that we are not deciding all of the questions set out in *Hewitt*, or even all of those raised by the facts of *Hewitt* or *Marvin*, in this case. Here we are asking only one question based upon the Glasgos' unique circumstances: is there any set of facts contained in Jane's complaint against Laurel upon which a court could grant her relief? To that question we must answer "yes."

Implicit in this answer, of course, is the rejection of appellant's contention that to do so is against the public policy of this state. Rejection of common law marriages in Indiana was done ostensibly on the grounds that their recognition encouraged fraud and perjury, most notably in actions against decedent's estates and for social security or wrongful death benefits. *See, Anderson v. Anderson*, (1956) 235 Ind. 113, 131 N.E.2d 301; *Estate of Dittman v. Biesenbach*, (1953) 124 Ind.App. 198, 115 N.E.2d 125; *Azimow v. Azimow*, (1970) 146 Ind. App. 341, 255 N.E.2d 667, *trans. den.* Fundamental to the rationale of these cases, however, is the concurrent argument that such relationships are not only illegal, but also immoral and therefore against public policy. We appreciate the fact that Laurel did not attempt to define Jane's position as "meretricious" yet his public policy argument rests on case law in which this is a prominent theme. We believe that it ill behooves courts to categorize either the Hewitts' or the Glasgos' relationships as "meretricious" or "illicit" in any sense of those terms. Such epithets should be reserved for cases in which they are deserved. There are still situations to which such terms apply, but this case is not one of them. Here the specific facts which might give rise to a description of a meretricious relationship are conspicuously absent: the parties had been married formerly, they sought to rear their children in a family setting, they conducted themselves for a significant period of time as a conventional American family, the wife showed concern for her own and her children's future economic security. All the parties failed to do to conform to societal norms of marital behavior was to complete the legal formalities. To apply the traditional rationale denying recovery to one party in cases where contracts are held to be void simply because illegal sexual relations are posited as consideration for the bargain is unfair, unjust, and unduly harsh. Such unnecessary results probably do more to discredit the legal system in the eyes of those who learn of the facts of the case than to strengthen the institution of marriage or the moral fiber of our society. To deny recovery to one party in such a relationship is in essence to unjustly enrich the other.

In Indiana, common law crimes have been abolished, and in order for conduct to be deemed criminal or illegal it must be proscribed by the legislature. Our most recent criminal code does not attempt to proscribe sexual conduct between consenting adults in private (*see* Ind.Code 35–42–4–2), although it does still proscribe acts of prostitution (Ind.Code 35–45–4–2). Thus, any contract in which sexual services serve as consideration are unenforceable and void as against public policy. However, even though such part of a contract may be void, courts may excise the illegal segment and enforce the other provisions. *Brokaw v. Brokaw*, (1980) Ind.App., 398 N.E.2d 1385. Where it is possible, courts will construe agreements as being valid rather than void. *McGann & Marsh Co. v. K & F Mfg. Co.*, (1979) Ind.App., 385 N.E.2d 1183, *trans. den.; Prell v. Trustees of Baird & Warner Mortgage & Realty Investors*, (1979) Ind. App., 386 N.E.2d 1221, *trans. den.* Just as married partners are free to delineate in ante– or post–nuptial agreements the nature of their ownership in property, so should unmarried persons be free to do the same. *Bruch, supra.* In cases such as these, we agree with the *Marvin* and other courts that the marriage and divorce statutes would not apply. Recovery would be based only upon legally viable contractual and/or equitable grounds which the parties could establish according to their own particular circumstances. This is not to say, however, that if the Indiana legislature should speak to the question of unstructured domestic unions, Indiana courts could refuse to listen [4] or that Indiana courts may ignore Ind.Code 31–1–6–1. Claims brought as a common law spouse under the current Indiana dissolution of marriage or intestate succession statutes would clearly not be actionable. The current claim as we have pointed out above is not one of these. Therefore, the trial court did not err in refusing to grant appellant's motion to dis-

miss pursuant to T.R. 12(B)(6), nor was the judgment contrary to law as embodied in Ind.Code 31–1–6–1.

*Issue Two*

Laurel contends there was not sufficient evidence to support the trial court's judgment under the law of either implied contract or equity. He recognizes, however, his heavy burden on appeal since this court neither weighs evidence nor judges the credibility of witnesses. So long as there is evidence of probative value to support the trial court's findings, they will not be disturbed on appeal. *Miller v. Ortman*, (1956) 235 Ind. 641, 136 N.E.2d 17; *Grad v. Cross*, (1979) Ind.App., 395 N.E.2d 870. Furthermore, we shall consider only the evidence most favorable to the appellee and all reasonable inferences therefrom. *Grad v. Cross, supra; Shipley v. City of South Bend*, (1978) Ind.App., 372 N.E.2d 490; *Department of Commerce v. Glick*, (1978) Ind.App., 372 N.E.2d 479. The trial court's decision will be set aside only if the evidence leads to but one conclusion and the trial court reached another. *Owen Co. Farm Bureau Cooperative Ass'n. v. Waeger*, (1980) Ind.App., 398 N.E.2d 713.

Appellant alleges that there was no evidence from which even an inference could be drawn to support the theory inherent in an action based on implied contract that appellee's services were rendered in expectation of payment. He also alleges that equitable relief must be denied since there was no evidence presented that either party believed he or she was legally married. We reject both of these arguments. First, these are not the only two theories supported by the evidence and findings of the court upon which relief could be granted. Appellant's discussions of these theories are tied completely to concepts related to the marriage and dissolution statutes and

---

4. We note with interest that during this calendar year both Connecticut and Kansas have legislation pending which would bring civil actions arising out of marital–type relationships within the statute of frauds. *See* [1980] 6 Fam. L.Rep. (BNA) 2206 and 2439. On the other

hand, for purposes of its Family Relations Act the legislature of British Columbia has defined "spouse" to include unmarried cohabitants who have "lived together as husband and wife for a period of not less than two years." *Id.*, 2416–17.

common law marriage. He makes no distinction in his discussion for example between contracts implied in fact and those implied in law.[5] Second, there was evidence in Jane's testimony that Laurel had agreed on more than one occasion that they shared their possessions equally. There was also evidence in the form of Jane's testimony from which the court could infer that Jane expected tangible, and even monetary reward, in return for her services rendered as homemaker and stock keeper for Laurel. As stated by this court in *Moslander v. Moslander's Estate*, at 110 Ind. 122, 128–29, 38 N.E.2d 268:

> "[T]he law is firmly established that the intention to pay and the expectation of compensation may be inferred from conduct, where equity and justice require compensation, as well as from direct communications between the parties, or communications through other persons representing them. Intention to pay and expectation of compensation, like other ultimate facts, may be inferred from the relation and situation of the parties, the nature and character of the services rendered, and any other facts or circumstances which may reasonably be said to throw any light upon the question at issue. The right and justice of a claim for compensation, or its wrong and injustice, may be considered in ascertaining the intention and expectation of the parties in relation to compensation for services."

and at 110 Ind. 122, 132–33, 38 N.E.2d 268:

> "The determination that where the family relationship exists that no implied promise to pay for services rendered in and about the home will arise merely from the performance and acceptance of such services, is grounded upon the basic fact that according to human experience, and in the ordinary affairs of life, the giving or receipt of compensation for such services is not expected. But where a divorced wife returns to the home of her divorced husband, without remarriage, and performs the work of a household servant, the confidence, affection and cooperative spirit that ordinarily exists between members of a common family would not be presumed to exist. When we apply the information gained by experience in the ordinary affairs of life to such a situation, there is no reason to hold that an inference should be drawn, under such circumstances, that there was no expectation that compensation should be given or received therefor."

While we do not subscribe to the theory that cohabitation automatically gives rise to the presumed intention of shared property rights between the parties, we find in this case that it would be unjust for Laurel to assert in one breath that Jane can in no way be presumed to be his wife for purposes of either the dissolution of marriage statutes or the concept of putative spouse and to assert in another the presumption that she rendered her services voluntarily and gratuitously. Such presumption will not arise where, as here, there is substantial evidence to support not only an implied, but also an express, agreement to the contrary between the parties.

Because the court's findings were supported by the evidence and because the court's judgment was contrary neither to the facts nor to the law we affirm.

Affirmed.

ROBERTSON, P. J., and NEAL, J., concur.

---

5. For an especially perspicacious treatment of these distinctions in the current context, *see* Foster and Freed, *Marvin v. Marvin: New Wine in Old Bottles*, [1979] 5 Fam.L.Rep. (BNA) 4001. *See also, Moslander v. Moslander's Estate, supra.*