

FILED
Sep 14 2016, 9:01 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Zachary J. Stock
Zachary J. Stock, Attorney at Law,
P.C.
Carmel, Indiana

ATTORNEYS FOR APPELLEE

David A. Smith
Patrick J. Smith
McIntyre & Smith
Bedford, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeffrey L. McMahel,

*Appellant-Defendant*,

v.

Mary A. Deaton,

*Appellee-Plaintiff*.

September 14, 2016

Court of Appeals Case No.
59A04-1601-PL-91

Appeal from the Orange Circuit
Court

The Honorable Larry R. Blanton,
Judge

Trial Court Cause No.
59C01-1403-PL-73

**Brown, Judge.**

[1] Jeffrey L. McMahel appeals the trial court's order awarding certain property to Mary A. Deaton following their cohabitation. McMahel raises one issue which we revise and restate as whether the court's order is clearly erroneous. We affirm.

*Facts and Procedural History*

[2] In 1996, McMahel and Deaton met and Deaton moved into McMahel's house on Hudleson Street in Paoli, Indiana. McMahel and Deaton had one child together born in April 1998. McMahel and Deaton's relationship ended in February 2014.

[3] On March 20, 2014, Deaton filed a Complaint for Partition and/or Unjust Enrichment alleging she and McMahel resided together for a number of years, they have one child together, they had a joint bank account until September 2013, they acquired property together including real property and vehicles, and requesting an equitable distribution of the property. McMahel filed a counterclaim for trespass and conversion.

[4] On August 20, 2015, the court held a hearing at which the parties presented testimony and documentary evidence. Deaton called McMahel as a witness and asked when he and Deaton began residing together, and McMahel replied that "[t]o be honest from April 9th she would not leave," that "I never asked her to come to my home, ever," and that "[s]he never left." Transcript at 49. McMahel testified that Deaton moved around, and when asked how often she left, he replied "[a]t least half the time but would not stay gone. She would

come back." *Id.* at 51. When asked when Deaton's name was added to his account at Hoosier Hills Credit Union, McMahel replied he did not know the exact date but probably 2008 or 2009. When asked how long he was in a relationship with Deaton, McMahel replied "[p]robably never," and when asked what he called it, he answered "[a] mistake." *Id.* at 53. McMahel testified that he worked for Essex, the plant closed in 2003, he received a severance, he was unemployed for one year and received unemployment benefits, and that he worked for Production Heating and Cooling from 2004 until 2009, when he became disabled. He testified that he purchased a home on Sandyhook Road at an auction in 2002 and the closing occurred in 2003, that Deaton was present during the auction, and that they probably discussed the purchase but did not discuss the finances.

[5] Deaton testified that she was in a relationship with McMahel from April 1996 until February 2014 and that they resided together during that time. She testified they did everything as a family, made purchases together, and took vacations. She stated that, when she first moved in with McMahel, he was living on Hudleson Street and that he had purchased the residence the previous month, that their son was born in 1998, and that she, McMahel, and their son moved to the Sandyhook Road residence. She also testified that, around Christmas time of 1997 or 1998, she and McMahel purchased a living room suite and that her sister co-signed a loan to help McMahel establish his credit after he filed for bankruptcy. She also testified that she and McMahel

purchased a truck that he drove and a car as her main transportation and that they made these decisions together.

[6]     With respect to her earnings, Deaton testified that she began working at Hoosier Uplands in August of 1998, her salary in 2000 was about $14,000 and gradually increased, and that she earned just under $19,000 in 2013. She stated that she worked from August through May, was off in the summers, received unemployment benefits, and that her income was deposited into the joint account with McMahel. When asked when the joint account was created, Deaton responded that McMahel already had the account in his name and then they added her name and that she was "pretty sure" that occurred before her son was born. *Id.* at 69. The court admitted into evidence certain tax and employment documents showing that Deaton earned wages of approximately $2,919 in 1998; $13,719 in 2000; $14,261 in 2001; $15,637 in 2002; $18,131 in 2003; $15,990 in 2004, $16,403 in 2005; $18,263 in 2006; $17,053 in 2007; $18,870 in 2011; $15,727 in 2012; and $18,755 in 2013.

[7]     Deaton presented bank statements of McMahel and Deaton from Hoosier Hills Credit Union for July of 2005 through July of 2013, into which the parties made deposits and later direct deposits from Hoosier Uplands and social security. Deaton testified that she and McMahel paid all of the bills and made all of their purchases from the checking account, including utilities, household items, groceries, insurance, and medical expenses. She also testified that the money for purchasing vehicles and four-wheelers came from the joint account and that the only debt was the home mortgage.

[8]     Deaton also presented an itemized list of assets showing a value for each based upon an appraisal, statement, guide, or personal belief, including a house, Deaton's 401(k), McMahel's IRA and savings, a 1996 Chevy, a Subaru Tribeca,[1] a 2009 Harley Davidson, an ATV, a Genesis Boat, a 1998 Suzuki dirt bike, a 2001 Honda EX, two 4-wheelers, two trailers, a golf cart, and two riding mowers. She presented print-outs of guides from the National Automobile Dealers Association regarding the value of the 1996 Chevy, the Subaru, the 2009 Harley Davidson, the ATV, the 1998 Suzuki, one of the 4-wheelers, and the 2001 Honda. Deaton also presented Hoosier Hills bank statements for 2014, and the statement for the period of February 1, 2014, through February 28, 2014, the month in which the parties' relationship ended, showed an IRA with a previous balance of $13,671.58, and a mortgage loan with a previous balance of $8,300.21. Deaton testified that McMahel had her name taken off of the account near the end of 2013.

[9]     Deaton further testified that McMahel opened the IRA in 2003 and had rolled over funds from a 401(k) into the IRA. When asked if the IRA had about seven thousand dollars at the time, she answered that she was unsure.[2] She also stated that she worked for Hoosier Uplands for several years before she signed up for her retirement account and that she started working there after she began

---

[1] Deaton's list of assets includes a 1998 Subaru Tribeca, and the value guide she submitted relates to a 2008 Subaru Tribeca.

[2] The earliest statement from Hoosier Hills in the record is for the period of July 1, 2005, through August 1, 2005, and indicates that the IRA's previous balance was $7,081.91.

her relationship with McMahel. She presented a statement from her 401(k) showing it had a value of $28,521.37 on January 1, 2014. She presented an appraisal report dated March 23, 2015, for the residence on Sandyhook Road which stated that the value by a sales comparison approach was $105,000.

[10] Deaton testified that she owned some property together with her sister that they had received from their parents, that likewise McMahel owned some property with his father, there were no joint efforts to acquire them, and those properties should be set aside. She testified that $4,100 was spent from her joint account with McMahel toward the construction of a garage on the property owned by McMahel and his father but that she was not including that in her list of assets to be divided. She testified that McMahel's earnings were probably higher than her earnings, that she kept the home, she was the person who cleaned the gutters, painted the house, cleaned the toilets, and cooked, and that she was their son's primary caretaker.

[11] McMahel presented evidence that he received proceeds of $7,333.34 from the sale of real estate in October 2002 and testified that he had "sold ten (10) acres of [his] grandpa's property that actually paid for the down payment" on the Sandyhook Road property. *Id.* at 130. He testified that he took a mortgage with Hoosier Hills to finance the remaining portion of the purchase price and presented a mortgage dated February 7, 2013, identifying him as the borrower and securing a promissory note in favor of Hoosier Hills in the original amount

of $59,400.[3] He also testified that he gave a cashier's check of $20,900 to a car dealership when the Subaru was purchased and that he received the money from back pay for disability.[4] He testified that he received disability benefits of $1,630 per month, and that he earned around $40,000 per year when he worked for Essex, that he earned about $65,000 per year at Production Heating and Cooling, and that in his final year of working he earned $67,500 "counting everything." *Id.* at 146. With respect to the IRA, McMahel testified that he had "an account with Essex before [Deaton]," *id.* at 147, that he transferred the funds to an IRA after his employment with Essex ended, and that he has not contributed to the IRA since then.[5] On cross-examination, McMahel indicated that the mortgage payments were made from the Hoosier Hills account, and that his salary of $67,500 included his vehicle, that he was hired at a rate of around $16.75 per hour, and that he received a commission check as well.

[12] Following the hearing, the parties submitted proposed findings of fact and conclusions, and on December 11, 2015, the court entered its findings and conclusions, awarded certain property to Deaton, and ordered McMahel to pay

---

[3] Deaton testified that McMahel purchased the Hudleson Street residence the month before she moved there. McMahel does not point to evidence regarding any equity he may have had in that residence when he and Deaton began their cohabitation.

[4] McMahel presented a copy of the cashier's check issued by Hoosier Hills dated June 29, 2011. The Hoosier Hills statement for the period of June 1, 2011, through June 30, 2011, shows a deposit of $22,516 on June 9, 2011, and a withdrawal by check of $20,900 on June 29, 2011.

[5] McMahel testified he worked for Essex until 2003. He does not point to testimony regarding when he started working for Essex or when and the extent to which he or his employer made contributions to his retirement account while he was employed there.

Deaton the sum of $13,102.30.  The court's findings of fact and conclusions state in part:

## Findings of Fact

1.  There is agreement, by the Parties, that they met in April of 1996, and entered into a relationship.  They began living together (co-habitation) almost immediately.  They resided together, in the house owned by Mr. McMahel.

                              * * * * *

4.  Plaintiff Deaton, during the term of co-habitation earned from $13,000 to $18,000 per year.  Her work was irregular and sometimes seasonal, depending on the needs of services provided by Hoosier Uplands . . . .

    Defendant McMahel, during the tenure of the relationship earned from his employment $40,000 to $67,000 per year.  His employment options and opportunities are severely limited due to complications arising from multiple sclerosis.  He now receives disability benefits of (approximately) $1,600 per month.

                              * * * * *

6.  However the Parties choose to define their physical and psychological relationship they lived in at least two residences together, they purchased vehicles, furniture and residential accouterments and they became parents to a son.

7.  Factually, the Parties presented a family unit.  They shared a home, they parented a child, they purchased vehicles and they traveled together.

8.  At some point in time (the exact time is in dispute) the parties began to comingle their assets.  They established and maintained a joint checking account.  Ms. Deaton claims that arrangement began in 1997.  Mr. McMahel estimates that arrangement began some time around 2005.

During this period of their co-habitation there were assets purchased - some jointly - some in their individual names and some for mutual use in the house where the three lived as a unit.

9.    There are titles to automobiles purchased in joint names. There are titles to vehicles in one name only.

10.   It is a fact that bank accounts were held in joint and that both [Deaton] and [McMahel] deposited money into that account. Funds were comingled in an account that existed for a significant period of time. (Ten years being the lesser estimate - seventeen years being the higher) There is a dispute as to when the co-mingling started and when it ended - but the fact remains that the joint account existed and it could have only occurred by active and willing participation of both parties.

The money in the joint account was used to fund the co-habitation, to support their lifestyle and to provide for their child.

Those funds were accessible to both parties equally, without limit.

The use of those funds enured to the benefit of both parties.

11.   That the parties resided in [McMahel's] home that he had acquired prior to the parties' relationship. In 2002 [McMahel] purchased his current home at auction. Said real estate was deeded solely into [McMahel's] name, and [McMahel's] name was the only one listed on the mortgage and note for said real estate, as evidenced by Defendant's Exhibit B and Exhibit D.

That [McMahel] contributed $7,333.00 towards the purchase of the real estate in 2002 through funds received through an estate for his grandfather, as evidenced by Defendant's Exhibit A and Exhibit C.

That payments towards the note and mortgage for the real estate were withdrawn from the parties' joint account through Hoosier Hills Credit Union, in which both parties' income was deposited from at least August, 2005 to June, 2013.

12. The real estate appraised for $105,000 (March 2015) with a mortgage balance of $8,300 remaining unpaid.

13. The courts . . . have determined that a party who co-habitates with another person, without subsequent marriage, is entitled to relief upon a showing of an express contract or a viable equitable theory such as implied contract or unjust enrichment.

There are no claims that any express contract exists.

The Court here finds that sufficient evidence was presented at the hearing to support an equitable claim for recovery. *See Bright v Kuehl*, 650 [N.E.2d] 311, 315 ([Ind. Ct.] App. 1995 (*reh'g denied*))[.]

14. Clearly, the evidence presented at the hearing showed that Deaton made economic contribution to the co-habitation. Decidedly, those contributions [] made by Deaton were not equal, and although Deaton benefitted significantly from the resources provided by McMahel[,] McMahel would be unjustly enriched if the court took the position that Deaton had no claim whatsoever to any of the assets held in McMahel's name alone, or to the growth in McMahel's asset base, that occurred during the years of their co-habitation.

Principles of equity prohibit unjust enrichment of a party who accepts unrequested benefits that another person provides, despite having the opportunity to decline those benefits.

Deaton has presented evidence of a long term co-habitation and that to some extent McMahel was unjustly enriched thereby. They were together for almost nineteen

years. During which time they parented a child, went places and bought things that were paid from their joint efforts. Funds were expended from their joint bank account.

\* \* \* \* \*

16. There are individual retirement accounts held in the separate names of the parties. It is determined that there were no agreements, no intention of the parties to co-mingle or jointly claim those individual accounts. . . .

\* \* \* \* \*

20. During their intimate tenure they acquired property and possessions. Some they held in joint, some were Deaton's exclusively. Some of the acquired possessions and property were/are exclusively McMahel's.

\* \* \* \* \*

22. McMahel became disabled due to complications from Multiple Sclerosis. Since his disability (in 2009) his earning capacity decreased from approximately $67,000 a year to $1,600 per month through disability services (approximately $19,200.00 per year). His earning ability is severely and permanently impaired.

\* \* \* \* \*

**Conclusions of Law**

1. The Parties lived together, created a life as a family unit and parented a child during their 19 years of co-habitation;

2. There has been sufficient evidence of the co-habitation and the co-mingling of assets to cause the Court to recognize equitable remedy under the unjust enrichment criteria;

3. The earning capacity of McMahel has drastically diminished. Deaton's earning capacity is reasonably unaffected and remains stable depending on her initiative and work ethic;

4.    [Deaton] presents a statement of assets with her calculated valuations. The home was appraised and that value is accepted without demur.

The other itemized assets and [Deaton's] valuations are as follows: (motor vehicles valuation by NADA estimate)

| ASSET | VALUE | |
|---|---|---|
| House | $105,000 | |
| Deaton 401(k) | 28,521 | |
| McMahel IRA | 13,672 | |
| '96 Chevy 1500 | 3,250 | joint title |
| '98 Subaru Tribeca | 9,500 | joint title |
| 2009 Harley Davidson | 12,000 | |
| 2001 E-Ton ATV | 500 | |
| Genesis Boat | 9,000 | |
| 1998 Suzuki dirt bike | 900 | |
| 2001 Kawas[a]ki 4 wheeler | 13,000[6] | |
| 2001 Honda Ex | 400 | |
| 2009 125 - 4 wheeler | 2,000 | |
| 1999 ASM car Trailer | 500 | joint title |
| 1995 enclosed Trailer | 500 | |
| Golf cart | 1,000 | |
| John Deere Law[n] Mower | 1,000 | |
| MTD Lawn Mower | 400 | |

---

[6] The value submitted on Deaton's list for this asset is $1,300.

182,511 gross estate[7]

\* \* \* \* \*

7.    It is evident that during this period of cohabitation Mr. McMahel was the beneficiary of Ms. Deaton's affections, labors and economic contributions. It is also evident that based on Ms. Deaton's earnings and economic situation that she benefitted from this relationship as well, beyond her means. She was provided a home, transportation, stability and a standard of living beyond her financial means. She received a significant benefit from this association.

8.    Mr. McMahel shall retain the residence and have sole ownership of the realty located on Sandyhook Road.

9.    Deaton shall be awarded property as follows:

| Asset | Value |
| --- | --- |
| 1998 Subaru Tribeca | 9,500 |
| 2009 125 4 wheeler | 2,000 |
| 1999 ASM Trailer | 500 |
| MTD Lawn Mower | 500 |
| 1998 Suzuki dirt bike | 900 |
| Deaton 401K | 28,251[8] |
| | $41,651.02 |

McMahel Equalization payment to Deaton    $13,102.30

Total Award to Deaton    $54,723.30[9]

---

[7] The sum of these amounts, including a positive value of $1,300 for the 2001 Kawasaki and a negative value of $8,300 attributable to the home mortgage, is $181,143.

[8] In paragraph 4 of its conclusions, the court stated the value of Deaton's 401(k) as $28,521.

[9] The addition of $41,651.02 and $13,102.30 is $54,753.32.

Appellant's Appendix at 7-19.

## *Discussion*

[13] The issue is whether the trial court's December 11, 2015 order is clearly erroneous. When a trial court enters findings of fact and conclusions thereon, findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* When a court has made special findings of fact, an appellate court reviews sufficiency of the evidence using a two-step process. *Id.* First, it must determine whether the evidence supports the trial court's findings of fact, and second it must determine whether those findings of fact support the trial court's conclusions. *Id.* Findings will be set aside only if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.*

[14] McMahel requests this court to reconsider the holding in *Bright v. Kuehl*, 650 N.E.2d 311 (Ind. Ct. App. 1995), *reh'g denied*, regarding the equitable remedies that may be invoked in disputes between formerly cohabiting couples who never married and that an express agreement should be required before dividing the property acquired by unmarried, formerly cohabiting couples. He asserts

that certain agreements and relationships are so difficult to delineate that they should be written down. McMahel next contends that there is no evidence that he was unjustly enriched by his cohabitation with Deaton or that there was an implied contract between the parties and therefore the court's judgment is clearly erroneous. He argues the court never found that he received any greater benefit from Deaton than Deaton received from him, that he and Deaton commingled funds but there is no evidence that either of them expected that their money would be returned, that there is no evidence he and Deaton left the relationship in wildly unequal financial positions, and that Deaton left with a larger retirement savings than him. He argues that "[t]he problem here is that the case was treated like a divorce," that "[a]ll parties involved seemed to assume that there should be a division of assets in keeping with the income of the parties," and that "this approach completely ignored the assets brought to the relationship and the reciprocal financial and emotional benefits enjoyed during the relationship." *Id.* at 14-15.

[15] Deaton contends that McMahel has waived his arguments because he failed to raise them before the trial court and that he had accepted, at the hearing below and in his proposed findings and conclusions, that *Bright* was applicable and that the trial court intended to apply that case. Deaton further argues that the doctrine of *stare decisis* prohibits overturning *Bright*, that McMahel is asking for twenty-year-old precedent to be overturned, that "many Hoosiers—including both McMahel (by his own admission) and Deaton—have relied on the holding in *Bright* to settle disputes arising from the breakups of their non-marital

relationships," that "[t]o yank the rug out from under that understanding, as McMahel urges, would seriously unsettle the state of the law in this area," and that "[t]herefore, this Court should be very reluctant to reconsider *Bright*." Appellee's Brief at 20-21.

[16] In addition, Deaton maintains that there is ample evidence to support the relief ordered by the court and that the court's equitable relief in her favor is actually very modest in comparison to the parties' total assets.

[17] In *Bright v. Kuehl*, this court addressed whether a party is entitled to relief based upon contributions during cohabitation without subsequent marriage absent an express agreement. 650 N.E.2d at 314. The court first discussed the case of *Glasgo v. Glasgo*, where a former wife sued her former husband for one-half of the assets accumulated during their period of cohabitation after their divorce and the trial court awarded the former wife a share of the property. *Id.* (citing *Glasgo*, 410 N.E.2d 1325 (Ind. Ct. App. 1980), *reh'g denied*). The former husband argued on appeal that claims by nonmarried cohabitants were against public policy in Indiana because common law marriages were prohibited, and this court affirmed the trial court's decision and expressly stated that granting the petitioner relief was not against the public policy of this state and that recovery for parties seeking relief "would be based only upon legally viable contractual and/or equitable grounds which the parties could establish according to their own particular circumstances." *Id.* (citing *Glasgo*, 410 N.E.2d at 1331). The court in *Bright* then discussed the case of *Chestnut v. Chestnut*, in which this court approved the rationale in *Glasgo* and affirmed the trial court's

decision to include the wife's contributions during premarital cohabitation in the distribution of marital property upon dissolution. *Id.* at 314-315 (citing *Chestnut*, 499 N.E.2d 783 (Ind. Ct. App. 1986)). Finally, the court in *Bright* noted that other jurisdictions have adopted this right to relief and have held that unmarried couples may raise equitable claims such as implied contract and unjust enrichment following the termination of their relationships where one of the parties attempts to retain an unreasonable amount of the property acquired through the efforts of both. *Id.* at 315 (citing cases from California, Connecticut, Minnesota, Nevada, North Carolina, Pennsylvania, and Wisconsin).

[18] Following this discussion, we held in *Bright* that "a party who cohabitates with another without subsequent marriage is entitled to relief upon a showing of an express contract or a viable equitable theory such as an implied contract or unjust enrichment." *Id.* We specifically held that, "[t]o recover under the theory of implied contract, the plaintiff is usually required to establish that the defendant impliedly or expressly requested the benefits conferred" and that "[a]ny benefit, commonly the subject of pecuniary compensation, which one, not intending it as a gift, confers upon another who accepts it, is an adequate foundation for a legally implied or created promise to render back its value." *Id.* (citations omitted). We further held that, "[t]o prevail on a claim for unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust" and that

"[p]rinciples of equity prohibit unjust enrichment of a party who accepts the unrequested benefits another provides despite having the opportunity to decline those benefits." *Id.* at 316 (footnote and citations omitted). *See also Sclamberg v. Sclamberg*, 220 Ind. 209, 212-215, 41 N.E.2d 801, 802-803 (1942) (holding that although the purported marriage was void, the court could settle the property rights acquired during the "marriage relation").

[19] In *Turner v. Freed*, the trial court ordered Danny Turner to pay Angela Freed $18,000 under a theory of unjust enrichment. 792 N.E.2d 947, 949 (Ind. Ct. App. 2003). Specifically, the trial court found that, "[a]lthough the relationship provided a home, resources, and some financial security to [Freed] for a number of years, it is also important to acknowledge that [Turner] received some modest benefit from food, clothing, and other financial contributions made by [Freed] and that *he received substantial benefit from her homemaking and housekeeping responsibilities*." *Id.* at 950. The trial court further found that, "[a]lthough [Turner's] economic contribution to the joint household exceeded [Freed's], and although [Freed] benefit[ed] significantly from the resources provided by [Turner], he would be unjustly enriched if the Court took the position that [Freed] had no claim whatsoever to significant assets which are held in [Turner's] name alone, or the growth in his asset base that occurred during the years of their cohabitation." *Id.* On appeal, Turner argued the court erred in finding that he had been unjustly enriched by Freed's domestic services. *Id.* at 649.

[20] In addressing Turner's argument, we first observed that we had already determined that a party who cohabites with another person without subsequent marriage is entitled to relief upon a showing of an express contract or a viable equitable theory such as an implied contract or unjust enrichment. *Id.* at 950 (citing *Bright*, 650 N.E.2d at 315). We held that Freed presented evidence to demonstrate that Turner was unjustly enriched. *Id.* In support of our conclusion, we noted that Turner and Freed lived together for about ten years; that during that time Freed took care of their child and at times Turner's child from a previous relationship; that Freed regularly maintained the home and contributed financially by performing one of Turner's daily newspaper delivery routes; that while Freed took care of the children and the home, Turner had the time to develop his business; and that Turner purchased a home and furnishings from the income generated through his employment. *Id.*

[21] We held that, "[a]lthough it is true that Freed benefited from the resources and home provided her by Turner, we also agree with the trial court that Turner substantially benefited from the services Freed provided and that Turner would be unjustly enriched if Freed were awarded no part of the value of the assets Turner acquired in his name alone during their cohabitation" and that, "[a]ccordingly, we conclude there is evidence to support the trial court's finding that Turner had been unjustly enriched." *Id.* at 950-951. We also noted that, because we found support for the trial court's decision under the theory of unjust enrichment, we did not need to not address Turner's implied contract arguments. *Id.* at 950 n.2. *See also Neibert v. Perdomo*, 54 N.E.3d 1046, 1051-

1052 (Ind. Ct. App. 2016) (stating that the cases of *Glasgo* and *Chestnut* allowed recovery for cohabiting couples who cohabited either before marriage or after divorce, that later *Bright* expressly eliminated the exclusion from relief for couples who cohabit without ever marrying, that thereafter *Turner* granted equitable relief where parties cohabited without marriage, and that the cohabitation relationship is important to the extent that it provides evidence of the couple's relative expectations); *Putz v. Allie*, 785 N.E.2d 577, 580 (Ind. Ct. App. 2003) (observing the holding in *Bright*), *trans. denied*.

[22] Based on our previous decisions and the reasons for those decisions, we decline McMahel's invitation to reconsider the holding in *Bright* or other cases regarding the equitable remedies available to Indiana courts in addressing claims by formerly cohabiting persons based upon the theories of implied contract and unjust enrichment.

[23] Turning to the evidence presented in this case, the record reveals that Deaton moved in with McMahel in 1996, that the parties had a child together in 1998, and that their relationship ended in 2014. The parties presented evidence of their incomes, other resources, and the value of the assets accumulated during the period of their cohabitation. The evidence establishes that the parties made deposits from their respective earnings from employment or other resources into an account at Hoosier Hills and that the funds were used to pay the mortgage and utility expenses, medical expenses, and other regular and one-time living expenses and asset purchases over the period of their cohabitation. The court was able to review ten years' worth of monthly Hoosier Hills statements

showing the parties' various deposits into and expenses paid from the checking account, the monthly mortgage balance, and the monthly balance in McMahel's IRA. Further, the evidence establishes that the Sandyhook Road house purchased in 2003 was financed by a mortgage paid from the Hoosier Hills checking account and a down payment using money McMahel received the previous year. The court heard testimony that Deaton and McMahel did everything as a family and took vacations, that Deaton's sister co-signed a loan to help McMahel establish his credit, and that Deaton cleaned the gutters, painted the house, cleaned the toilets, cooked, and was the primary caretaker of the parties' son. The evidence does not indicate that McMahel rejected the benefits provided by Deaton or declined to accept her financial or other contributions. Evidence in the record supports the trial court's findings.

[24] In addition, the trial court found that the value of Deaton's earnings was thirty percent of McMahel's earnings, and we note that the court awarded Deaton assets valued at approximately thirty percent of the parties' combined assets. Thus, the court awarded Deaton a share of the assets accumulated by the parties during their cohabitation which was proportionate to her share of the parties' combined income during the same period.

[25] While Deaton benefited from the resources provided to her by McMahel, McMahel also substantially benefited from the monetary and other contributions provided by Deaton during their cohabitation of over seventeen years. We conclude the evidence supports the trial court's award of certain property to Deaton and its order that McMahel pay Deaton the amount of

$13,102.30. *See Turner*, 792 N.E.2d at 950-951 (concluding that there was evidence to support the trial court's finding that defendant had been unjustly enriched).[10]

### Conclusion

For the foregoing reasons, we affirm the December 11, 2015 order of the trial court.

Affirmed.

Baker, J., and May, J., concur.

---

[10] Because we find support for the trial court's decision under the theory of unjust enrichment, we need not address the theory of implied contract. *See Turner*, 792 N.E.2d at 950 n.2.